NOTICE

*Memorandum decisions of this court do not create legal precedent.  A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| MUNICIPALITY OF ANCHORAGE ) <br> d/b/a/ Municipal Light & Power ) <br> Department, a municipality of the State ) <br> of Alaska, ) <br> ) <br> Appellant and ) <br> Cross-Appellee, ) <br> ) <br> v. ) <br> ) <br> STATE OF ALASKA, ) <br> DEPARTMENT OF REVENUE, ) <br> ) <br> Appellee and ) <br> Cross-Appellant. ) <br> _____ ) | Supreme Court Nos. S-15710/15739 <br><br> Superior Court No. 3AN-13-08916 CI <br><br> MEMORANDUM OPINION <br> AND JUDGMENT[*] <br><br> No. 1558 – November 12, 2015 |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Mark Rindner, Judge.

Appearances: John Andrew Leman and Paul J. Jones, Kemppel, Huffman & Ellis, P.C., Anchorage, for Appellant and Cross-Appellee.  John M. Ptacin, Assistant Attorney General, Anchorage, and Craig W. Richards, Attorney General, Juneau, for Appellee and Cross-Appellant.

Before:  Stowers, Chief Justice, Fabe, Winfree, Maassen, and Bolger, Justices.

_____

[*]    Entered under Alaska Appellate Rule 214.

Municipal Light and Power Department (ML&P), the Municipality of Anchorage's electric utility, appeals the superior court's affirmance of the Office of Administrative Hearings' (OAH) decision that ML&P had not provided sufficient evidence to disturb the State of Alaska, Department of Revenue's determination that ML&P was not entitled to a refund on gas-production taxes for the years 1999 through 2005. Having reviewed the record and considered the arguments on appeal under the required deferential standard of review,[1] we AFFIRM the superior court's affirmance of the OAH's decision for the reasons set out in the superior court's decision, attached as Appendix I; the decision of the OAH is attached as Appendix II. We therefore do not address the Department of Revenue's cross-appeal.

---

[1]    When the superior court acts as an intermediate appellate court in an administrative proceeding, we directly review the agency's decision. *DeYonge v. NANA/Marriott*, 1 P.3d 90, 94 (Alaska 2000). We review an agency's factual findings using the substantial evidence test. *Id.* "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Id.* (quoting *Miller v. ITT Arctic Servs.*, 577 P.2d 1044, 1046 (Alaska 1978)). Whether the quantum of evidence is substantial is a question of law. *Shea v. State, Dep't of Admin., Div. of Ret. & Benefits*, 267 P.3d 624, 630 (Alaska 2011). We "must take into account whatever in the record fairly detracts" from the weight of evidence in determining whether evidence is substantial. *Id.* (quoting *Lopez v. Adm'r, Pub. Emps.' Ret. Sys.*, 20 P.3d 568, 570 (Alaska 2001)).

IN THE SUPERIOR COURT FOR THE STATE OF ALASKA

THIRD JUDICIAL DISTRICT AT ANCHORAGE

| | |
|---|---|
| MUNICIPALITY OF ANCHORAGE<br>d/b/a MUNICIPAL LIGHT & POWER,<br><br>        Appellant/Cross-Appellee,<br><br>    vs.<br><br>STATE OF ALASKA, DEPARTMENT<br>OF REVENUE,<br><br>        Appellee/Cross-Appellant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) Case No. 3AN-13-8916 Cl |

**ORDER REGARDING ADMINISTRATIVE APPEAL**[*]

This administrative appeal involves the State of Alaska's taxation of natural gas production. The Municipality of Anchorage d/b/a Municipal Light and Power (ML&P) is one of three entities that owns and produces gas in the Beluga River Unit gas field (BRU). From 1996 through 1998, ML&P used a combination of BRU gas it produced as well as gas it purchased from the two other BRU owners under long-term gas supply contracts to generate power. ML&P also sold gas it produced to Enstar and Chugach Electric Association (Chugach). In general, a company that produces natural gas owes production taxes to the State.

ML&P alleges that, beginning in 1999, it began allocating the gas it was required to purchase from the two other BRU owners to fulfill the Enstar and Chugach

---

[*] This decision has been edited to conform to the technical rules of the Alaska Supreme Court and for minor corrections; internal citations to the record have been omitted.

contracts and began using the gas it produced for its own power generation. ML&P argued to the State's Department of Revenue (DOR) that it should not owe production taxes on the gas sold to Enstar and Chugach because it was only reselling the gas it bought from the other BRU owners. More controversially, ML&P also argued that it did not owe production taxes on the gas it produced and then used for its own purposes. ML&P's production tax liability would be significantly reduced under these theories. However, ML&P continued paying production taxes according to DOR's preferred valuation under protest. ML&P claims that it continued to allocate gas in this manner through 2005.

In 2004, the Supreme Court of Alaska vindicated ML&P's argument that gas ML&P produced and then used for its own power-generation needs was not taxable.[1] ML&P requested a refund from DOR. That refund would be approximately $4 million. DOR denied the request and ML&P appealed to the Office of Administrative Hearings (OAH). OAH upheld DOR's denial and ML&P again appeals. DOR has also filed a cross-appeal; primarily out of an "abundance of caution." The central question before the Court is whether there is substantial evidence in the record supporting OAH's finding that ML&P did not prove that it supplied purchased gas to Enstar and Chugach. The Court finds that substantial evidence supports OAH's decision and affirms.

## STATEMENT OF FACTS

### I.    ML&P and the BRU

ML&P is a municipal-owned power-generation utility providing power within a portion of the Municipality of Anchorage. ML&P uses gas to generate the power it sells to its customers. Various government agencies have oversight over ML&P

---

[1]    *State, Dep't of Revenue v. Municipality of Anchorage*, 104 P.3d 120 (Alaska 2004).

and its operations. Of particular relevance to this suit are DOR, the Alaska Public Utilities Commission (APUC), the Department of Natural Resources (DNR), the federal Minerals Management Service (MMS), the Internal Revenue Service (IRS), and the Regulatory Commission of Alaska (RCA).[2]

In 1991, ML&P entered into three long-term gas supply contracts with the then-working interest owners of the BRU: Shell Western E&P, Inc. (Shell), ARCO Alaska, Inc. (ARCO),[3] and Chevron U.S.A., Inc. (Chevron). ML&P agreed to purchase "gas in the amount of one-third (1/3) of ML&P's Total Gas Requirements" from each company. The agreements specifically provided that the purchased gas is "gas to be delivered to ML&P into the facilities of Enstar or Chugach . . . at the current geographical location of the Beluga River Field or some other point(s) mutually agreeable to the producing company and ML&P." An exhibit to the original agreements provided that the gas would be delivered to ML&P at the "outlet side of [each producer's] meters at the Beluga River Field, and at such other locations as may be agreed upon by the parties." ML&P obtained title to the gas only after it passed the delivery point. These agreements were all intended to last until December 31, 2005. The

---

[2] These agencies are relevant to this case for different reasons, set out here briefly by way of background. DOR exercises taxing authority over ML&P and collected the 1999 through 2005 production taxes. The APUC is generally responsible for regulating public utilities. DNR is responsible for collecting state royalties from ML&P related to the gas it produces. MMS is similarly interested in obtaining any federal royalty payments, though it primarily operates through DNR. The IRS is responsible for determining the tax-exempt nature of the bonds ML&P issued in order to purchase its BRU interest. Finally, the RCA, which replaced the APUC, is responsible for setting utility tariffs in Alaska and approving any requested Cost of Power Adjustments sought by those utilities.

[3] ARCO was later replaced by Phillips and ConocoPhillips after that. These companies are referred to as "ARCO" throughout this memorandum for simplicity.

BRU layout was roughly depicted in the underlying administrative proceeding using the attached illustration.

Gas can flow in only one direction from the well pads. Gas is collected from the well pads and then transmitted to the intersection marked as "A." At point A, the gas is either diverted to go to Chugach's facility or moves forward toward Enstar's pipeline. The gas is likely metered at point B (for gas to Chugach) or point D (for gas to the Enstar pipeline). However, the testimony regarding meter locations and meter ownership was not clear and no detailed diagrams were included in the record.

While all three companies own the BRU gas, ARCO is in charge of the field's operations. ARCO produced several different kinds of statements concerning the field's operations. The first type is a statement known as an "offtake statement." ARCO produced offtake statements to reflect the activity that occurred in a given month. They were subject to later revision as necessary. The offtake statements generally show the amount of gas produced from the field, to whom the gas was sold, the amount sold to each purchaser, and to which producer the sale was attributed.

ARCO also created annual gas balancing settlement sheets. The parties' ownership of the BRU is governed, at least in part, by a gas balancing agreement. This agreement governs how the parties deal with their relative production and how they determine what happens when one owner takes more than one-third of the production for the year.[4] The gas balancing settlement sheets describe the amount of gas taken from the

---

[4]     This is referred to as "overlift." Taking less than one-third of the year's production is "underlift." The records show ML&P as being consistently underlifted. As an underlifted party, ML&P could either attempt to claim the necessary capacity to bring it into parity with the other producers later in the life of the field (though with some limitations) or receive a balancing payment.

BRU, to whom it was distributed, to which producer each distribution was attributed, and any overlift or underlift.

ARCO may have also created royalty reports required by various state regulations.[5] These would demonstrate where ARCO, and possibly the other BRU owners, actually sold their gas. The Administrative Law Judge (ALJ) did not include any royalty statements in his determination and the Court does not have any such statements properly before it.

## II. ML&P's Purchase of Shell's BRU Interest

In 1996, Shell sold its one-third interest in the BRU to ML&P. In addition to gaining a one-third interest in the BRU gas, ML&P also assumed gas supply contracts Shell had with other organizations, including Chugach and Enstar.

The APUC vetted the sale, took pre-filed testimony, and held hearings. Chugach strongly objected to the sale because of ML&P's assumption of the Chugach-Shell gas supply contract.[6] The evidence in front of the APUC discussed potential dangers to Chugach in detail as well as how ML&P intended to run its new gas ownership interest. During that hearing, there was some discussion of gas allocation. For example, one ML&P witness indicated that ML&P would continue to use ARCO and Chevron gas to power its generators. Other ML&P witnesses stated that ML&P would reallocate the gas it received from ARCO and Chevron to supply the Enstar and Chugach contracts.

This latter testimony came up in the context of ML&P's financing of the purchase. ML&P intended to use a mixture of equity and tax-exempt municipal bonds

---

[5] There is some confusion in the record regarding the role the offtake statements played in royalty reporting.

[6] Chugach appears to have been concerned about having ML&P, which it viewed as a competitor, in control of a portion of its gas supply.

to purchase Shell's BRU interest. One condition for municipal bonds to be tax-exempt is that no more than ten percent of the bond amount can be used for private activity. Thus, if ML&P used the bonds to buy one-third of the gas in the BRU,[7] no more than ten percent of that gas could be used for private activity. In the context of this deal, any gas ML&P produced and then sold to Chugach and Enstar would count toward exhaustion of that allowance. Produced gas sold to Chugach and Enstar would be considered "bad use gas." Produced gas used for ML&P's own generation requirements would be considered "good use gas."

The APUC eventually consented to ML&P's purchase of Shell's BRU interest following stipulations from the parties. The Municipality issued the necessary bonds and the sale went forward.

Shortly after consummating its Shell purchase, ML&P announced its intent to reallocate the gas it was purchasing from ARCO and Chevron to fulfill the Chugach and Enstar contracts. ARCO agreed to the reallocation, but Chevron did not. ML&P does not claim that it reallocated any gas in 1997 or 1998.

In 2000, however, ML&P announced to Chevron and ARCO that it had reallocated all of the gas it purchased from them in 1999 to satisfy its obligations to Chugach and Enstar. "This was a paper allocation; there was no physical routing or rerouting of gas associated with" the reallocation.[8] The record does not demonstrate that Chevron has ever taken action to prevent ML&P from reallocating gas.

---

[7] The actual amount of ML&P's interest in the BRU financed by the bonds was less than one-third because ML&P also used a certain amount of equity in the deal. Using the equity-financed portion of ML&P's newly acquired gas would not count towards exhausting the private activity allowance.

[8] *In re Municipality of Anchorage,* OAH No. 08-0395-TAX at 8 (May 22, 2013).

## III.  The IRS Audit

The IRS later investigated whether ML&P had violated the private activity allowance.  In a July 2003 letter, the IRS noted that it had reached a preliminary adverse determination, finding that interest on the bonds would not be tax-exempt to the bondholders.  The IRS reviewed each of three series of bonds ML&P had issued and found that ML&P would go over the permissible amount of private activity for the bonds used to finance the Shell purchase.[9]

ML&P appealed the preliminary adverse determination.  The IRS Appeals officer found that the preliminary adverse determination involved a certain amount of speculation regarding future events,[10] that no violation had yet occurred, and that ML&P's stated plans would not necessarily violate the tax-exempt regulations.  The IRS and ML&P entered into a closing agreement resolving the IRS audit without adverse consequences for ML&P or the bondholders.  That agreement specifically noted that the IRS will recognize any reallocation of purchased gas reflected in the gas balancing statements.  The agreement also noted, however, that it "may not be cited or relied upon by any person or entity whatsoever as precedent in the disposition of any other case."

## IV.  The MMS Audit

DNR, on MMS' behalf, also audited ML&P.  This audit concerned ML&P's 2001 royalty payments.  DNR alleged that ML&P had been reporting the volumes and valuations of the gas it took from the BRU inaccurately.  DNR argued that

---

[9]     One of the bond series was issued to fund improvements to ML&P's electric systems.  The IRS had some concern that the proceeds of those bonds were used to fund the equity portion of ML&P's payment to Shell.

[10]     Part of this had to do with so-called "Period 3 gas," which was an additional 40 Bcf that Chugach had the right to attempt to purchase from ML&P under the supply contract ML&P assumed.  Whether that would happen had not been determined at the time.

ML&P had failed to "report the correct volumes and values for its sales to [Enstar], [Chugach], and sales volumes to ML&P as a customer." DNR found that ML&P "should only report the volume delivered to itself as reported by the [Offtake Statements] at the average price of its purchases from [ARCO] and Chevron." DNR further claimed that ML&P "should have reported the MMS share of Beluga River gas for their sales to [Enstar and Chugach] at the value on the sales invoices." Implicit in this conclusion was the finding that ML&P was selling produced, and not purchased, gas to Enstar and Chugach because ML&P would not owe royalties on gas it had not produced.

ML&P protested DNR's findings. The record does not contain any documentation of the audit's conclusion. DOR's witness claims that it is likely that DNR did not pursue the audit because DNR's proposed accounting method could have resulted in lower royalty payments. The exact reason is unclear from the record.

## V. ML&P's Refund Claim

In 2001, ML&P told DOR that it had been reallocating gas since 1999 and sought a refund of the production taxes it had paid on the gas provided to Chugach and Enstar. DOR denied the claim. Through the end of 2005, ML&P continued to claim it had reallocated the gas it purchased and seek refunds from DOR. The total amount of gas at issue from 1999 through 2005 is 32.5 million Mcf. 26.3 million Mcf went to Chugach and the remainder to Enstar. ML&P's requirement contracts with ARCO and Chevron expired at the end of 2005, making reallocation after that point moot.

DOR issued an Informal Conference Decision on ML&P's 1999 through 2005 refund claims on July 7, 2008. DOR formally denied the refund claims. DOR decided:

> ML&P's allocation method is not supported by facts sufficient to allow the claims for refund. The allocation method, originally applied retroactively, is merely a mathematical reallocation that makes paper adjustments to

reported volumes of gas. ML&P's paper allocation is not reflective of actual facts or events. The Beluga field operator statements or gas delivery arrangements did not change to reflect the allocation. ML&P has not shown that any change was made to its cost recovery requirements for RCA tariff filings.

## VI.    The OAH Decision

ML&P appealed DOR's refund denial to OAH on August 5, 2008. OAH assigned the matter to an ALJ. The parties submitted evidence to the ALJ through pre-filed testimony and exhibits. The parties submitted both direct and responsive pre-filed testimony.

On December 23, 2009, and after submitting all of the pre-filed testimony, the parties jointly moved for the ALJ to vacate the evidentiary hearing in the matter and establish a briefing schedule. The ALJ did so and the parties completed their briefing on June 21, 2010.[11] The ALJ held oral argument on December 20, 2010.

There the case rested until January 23, 2013, when the ALJ issued a Request for Supplemental Materials and, five days later, an Additional Request for Supplemental Materials. Both parties responded to the ALJ's requests. ML&P, however, objected to the ALJ's reliance on the supplemental responsive materials because the parties had agreed to resolve the case on the pre-filed testimony. ML&P claimed that reliance on the supplemental materials without granting ML&P the chance to conduct discovery and cross-examination would violate its due process rights.

Following the submission of the supplemental materials and a status conference with the parties, the ALJ released an early draft of his decision and invited feedback from the parties. ML&P responded in part by claiming that it would be "inappropriate for OAH of its own motion to seek, consider, or base its decision in any

---

[11]    Not including errata and a notice of additional authority that were filed.

way on evidence beyond the evidence that the parties have agreed must form the basis for OAH's decision" based largely on the fact that the parties had stipulated to try the case on the pre-filed testimony. DOR took the position that OAH could consider the supplemental materials without any additional proceedings or discovery.

The ALJ issued his final decision on May 22, 2013. After discussing certain background information, he specifically held that he would not consider any of the supplemental materials in rendering his final decision. He then launched into his analysis of the case.

The ALJ noted that ML&P had the burden of proving its case by a preponderance of the evidence. He applied that standard in order to answer ML&P's formulation of the relevant question: Do " 'all the facts and circumstances support ML&P's allocation of produced gas to its own use for generating electricity?' "

The ALJ first concluded that ML&P's contracts with ARCO and Chevron permitted ML&P to redirect the gas it purchased from them to someone else. The ALJ then determined that, at least with respect to Chugach, it was physically possible for ML&P to have routed gas that it purchased from ARCO and Chevron to Chugach.

The ALJ then turned to DOR's suggestion in the Informal Conference Decision that the nature of ML&P's reallocations as "paper allocations" undermined their validity. The ALJ found that paper allocations are the only possible type of allocation because the gas coming out of the BRU is all commingled. ML&P's gas, Chevron's gas, and ARCO's gas do not flow through individual, traceable pipelines, but are all carried through the same equipment. The ALJ noted that "an allocation case like this one is not about tracing commingled molecules along a pipeline and finding out where they went." Rather, "[a]ll ML&P must prove is that it owned sufficient quantities of the relevant types of gas at that location, that the allocation it proposes is a permissible one — not barred by contract or by law — and that it took all the relevant paper steps to

make the allocation." The ALJ's decision specifically held that "the paper trail of gas volumes is important" in a paper allocation situation. "Regulatory filings, contractual delivery points, and delivery records of particular volumes of gas may not casually be disregarded or left inconsistent with the desired allocation."

## A.    ML&P's Allocation to Chugach

The ALJ then discussed whether ML&P had proven it had reallocated purchased gas to Chugach. The ALJ noted again that it was possible for ML&P to do so, but found that ML&P had not proven its case. The ALJ found that there was no evidence that ML&P had actually taken delivery of purchased gas at Chugach's facility, such that ML&P could transfer that gas to Chugach. He noted that there is a formal system for reporting the delivery of purchased gas, i.e. the gas ARCO or Chevron would have sold to ML&P at Chugach's facility. ML&P, however, failed to file either its own sales point delivery reports or those of its BRU co-owners that would show ML&P taking delivery of any purchased gas at the Chugach facility.

On the other hand, the ALJ found that there was evidence demonstrating that ML&P did not have any purchased gas to distribute to Chugach. The ALJ noted that the record contained seven months of offtake statements.[12] These statements all showed "ML&P's purchased gas as delivered to ML&P at the ENSTAR pipeline" making it impossible for the gas to then be reallocated to Chugach because of Chugach's upstream location. Moreover, the offtake statements showed that the gas delivered to Chugach was attributed to ML&P's production. The ALJ found that this was even the case after ML&P had announced its reallocation strategy.

The ALJ rejected ML&P's claim that the offtake statements should not be attributed to ML&P because they were prepared by ARCO. The ALJ found that ARCO,

---

[12]    One monthly offtake statement for each tax year in question.

as the operator, was acting as ML&P's agent insofar as it filed documents required under the State's royalty regulations. Moreover, ARCO was also one of the gas producers from whom ML&P was buying the gas it claimed it was reallocating, and ARCO never indicated it was sending purchased gas to the Chugach plant. On this evidence, the ALJ found that the record indicated that ML&P only took delivery of the purchased gas at the Enstar pipeline, making a reallocation to Chugach impossible. The ALJ further found that the offtake statements indicated that "ML&P's obligation to Chugach had apparently already been fulfilled through a sales point delivery of its own production at the Chugach meters." The ALJ did not discuss the gas balancing statements in his analysis.

## B. ML&P's Allocation to Enstar

The ALJ then turned to Enstar. The ALJ began by noting that the offtake statements again indicated that ML&P's produced gas was being used to fulfill the Enstar contract. The ALJ noted, however, that ML&P might be "taking delivery of all of its produced and purchased gas at the ENSTAR pipeline inlet, and then transporting that gas . . . down the pipeline to a later distribution point, where some would be delivered to ENSTAR as purchaser and some to ML&P's own generation facilities."

The ALJ found, however, that it was physically impossible for ML&P to deliver purchased gas to ENSTAR. The ALJ noted that ML&P only took title to the purchased gas at " 'the outlet side' of certain meters at the beginning of the pipeline." Enstar, however, was supposed to receive the gas it purchased from ML&P at the inlet flanges of Enstar's meter station. The ALJ assumed that the point where ML&P took title to its purchased gas was downstream of Enstar's inlet flanges and found there was no contrary evidence in the record. He also specifically noted that he had requested evidence regarding the metering station layout, but that ML&P did not provide further information and objected to doing so.

The ALJ concluded that the evidence regarding Enstar was "frustratingly ambiguous." However, he found that the reallocation was inconsistent with the "formal indicia of gas ownership and allocation — the contracts and field records that show who owned gas at each point in the distribution cycle." He noted: "It may be that ML&P formed an intent to reallocate and even went so far as to obtain the permission of one important regulatory party, DNR, to proceed with doing so, but then failed to follow through to perfect the arrangement." Based on these findings, the ALJ denied ML&P's appeal with respect to Enstar. ML&P now appeals to this Court.

## STANDARD OF REVIEW

The ALJ's findings of fact are reviewed under the substantial evidence test.[13] This standard is discussed further below. The ALJ's resolution of questions of law not involving agency expertise is subject to the substitution of judgment standard.[14] The substitution of judgment standard grants no deference to the ALJ's legal conclusions.[15]

## DISCUSSION

**I.    There is substantial evidence in the record supporting the ALJ's conclusion that ML&P failed to prove that it used purchased gas to supply the Chugach and Enstar contracts.**

The primary question on appeal is whether substantial evidence supports the ALJ's decision.[16] Answering this question primarily turns on the evidentiary

---

[13]    *Williams v. State, Dep't of Revenue*, 938 P.2d 1065, 1069 (Alaska 1997).

[14]    *Id.*

[15]    *State, Dep't of Revenue v. Municipality of Anchorage*, 104 P.3d 120, 122 (Alaska 2004).

[16]    Neither party has appealed the ALJ's decision to exclude the supplemental

(continued...)

standard. If there is substantial evidence supporting the ALJ's finding that ML&P supplied produced gas to Enstar and Chugach, then ML&P is not entitled to the tax refund it seeks here.

> Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." We need only determine whether such evidence exists, and do not choose between competing inferences. We do not evaluate the strength of the evidence, but merely note its presence.[17]

" '[W]hether the quantum of evidence is substantial is a legal question.' "[18] An administrative decision will be upheld even in the face of conflicting evidence when supported by substantial evidence.[19] The Court does not reweigh the evidence.[20]

The main evidence on which the ALJ relied in finding that ML&P failed to prove that it had any purchased gas to allocate to Enstar and Chugach was the offtake statements prepared by ARCO, the BRU Operator. The statements purport to show how

---

[16]     (...continued)
materials. Therefore, the Court has conducted its analysis using only the original evidentiary materials and has similarly excluded the supplemental materials from its analysis. While the Court may not have conducted these proceedings in this manner, and the ALJ appears to regret having done so himself, the Court will not engage in a de novo review of the excluded materials.

[17]     *Handley v. State, Dep't of Revenue*, 838 P.2d 1231, 1233 (Alaska 1992) (quoting *Keiner v. City of Anchorage*, 378 P.2d 406, 411 (Alaska 1963)) (citing *Matanuska-Susitna Borough v. Hammond*, 726 P.2d 166, 179 n.26 (Alaska 1986); *Interior Paint Co. v. Rodgers*, 522 P.2d 164, 170 (Alaska 1974)).

[18]     *Williams*, 938 P.2d at 1069 (quoting *Fireman's Fund Am. Ins. Co. v. Gomes*, 544 P.2d 1013, 1015 n.6 (Alaska 1976)).

[19]     *Id.* (citing *Summerville v. Denali Ctr.*, 811 P.2d 1047, 1051 (Alaska 1991)).

[20]     *Id.* (citing *Miller v. ITT Arctic Servs.*, 577 P.2d 1044, 1049 (Alaska 1978)).

ARCO, as operator, distributed each working interest owner's produced gas. DOR initially introduced seven example offtake statements, each representing one month of each tax year in question. The MMS audit letter, which implicitly rejected ML&P's preferred allocation, further indicates that, at least in 2001, the offtake statements did not allocate ML&P's purchased gas to Chugach. Although not cited by the ALJ, DOR also introduced in its rebuttal testimony a spreadsheet summarizing the distribution of "ML&P's purchased and produced gas as indicated in the operator statements."[21] The spreadsheet indicates that the offtake statements consistently reported that ML&P's produced gas was used to satisfy ML&P's contractual obligations to Chugach and Enstar.

### A.    Chugach

With respect to Chugach, ML&P challenges any reliance on the offtake statements. ML&P notes that the offtake statements cannot possibly demonstrate the actual distribution of each BRU owner's produced gas because it is impossible to attribute certain molecules of gas to individual producers. ML&P also characterizes the offtake statements as preliminary reports subject to revision.

ML&P notes that the information in the offtake statements is specifically contradicted by the gas balancing statements ARCO prepared annually. ML&P further asserts that it had no obligation to use its gas in the manner reported by ARCO. ML&P claims that its later report to ARCO regarding its allocation of gas should control whether it sent produced or purchased gas to Chugach and Enstar.

---

[21]    ML&P did not object to the inclusion of this spreadsheet in the record. Both parties submitted their copies of all of the relevant offtake statements in response to additional requests from the ALJ. However, the ALJ explicitly did not consider these statements because they were not part of the agreed-upon pre-filed testimony.

DOR relies primarily on the offtake statements to demonstrate that ML&P used produced gas to satisfy its obligations to Chugach and Enstar. DOR also points out that this conclusion is consistent with MMS' audit letter. DOR argues that the gas balancing agreements "were simply ineffective examples of self-reporting, doing 'nothing to show ML&P's gas production was actually delivered as it claims.' "

Neither party disagrees with the ALJ's discussion of the importance of written reports in a paper allocation case. The essential question is whether the offtake statements and MMS' audit letter represent substantial evidence supporting the ALJ's finding that ML&P failed to meet its burden to demonstrate that it used purchased gas to satisfy its Enstar and Chugach contracts. The gas balancing statements and ML&P's statements regarding its claimed allocations are the primary contrary evidence.

As discussed, however, an ALJ's findings may be supported by substantial evidence even where contrary evidence exists. That is the case here. The offtake statements, while not prepared by ML&P, were prepared by the BRU field operator. Those statements directly contradict ML&P's claimed allocation and represent a significant inconsistency surrounding the written documentation of ML&P's gas allocations. It is particularly notable that these statements were subject to revision and that, even though ML&P informed ARCO of its preferred allocation, nothing in the record considered indicates that ML&P ever had ARCO revise the offtake statements to show ML&P's preferred allocation in the offtake statements themselves.[22] Instead, ML&P appears only to have provided ARCO with its preferred allocation on an annual basis to incorporate into the gas balancing statements.

---

[22] One of the admitted offtake statements is even labeled "REVISED," which seems to indicate that ARCO would, in fact, issue new statements when it received additional information. There are no offtake statements reflecting the revisions that ML&P's self-reported gas balancing statement amounts would require.

It would appear reasonable to interpret the gas balancing statements as a year-end summary of the offtake statements, which might give them greater weight than the individual offtake statements. In such a scenario, one could argue that ML&P simply treated the reallocation in the gas balancing statements as a de facto revision of the offtake statements. This is not an unreasonable argument, and the ALJ's failure to deal with this issue is troubling.

However, the ALJ's ultimate analysis was based on whether ML&P had met its burden to show that it used purchased gas to satisfy the Chugach and Enstar contracts. The ALJ specifically held that in a paper allocation case the relevant documents cannot simply be discarded when inconsistent. Neither party has challenged that analytic framework. Here, the offtake statements support the ALJ's finding that ML&P had not proven that it used purchased gas to satisfy its contracts with Chugach and Enstar.[23]

It is important to note that this case does not present a situation where an unrelated third party's documents are used to undermine the gas owner's declared intent. In fact, this case would likely be resolved much differently had the evidence against ML&P's preferred allocation been internal Chevron documents. Chevron is a joint BRU owner, but is not acting on ML&P's behalf and ML&P does not appear to have a way to require Chevron to change how Chevron has internally allocated the gas it sells.

Here, however, the relevant documents are reports prepared by the field operator, not a third party acting on its own behalf. ARCO's reports are ARCO's determination, as field operator, of where it was allocating each company's BRU production. ML&P is correct in asserting that the idea that ARCO's reports reflect the

---

[23]    Favoring the gas balancing statements over the offtake statements would also be a reevaluation of contradictory evidence. The Court is not tasked with reweighing the evidence on appeal.

actual transmission of individual gas molecules marked "ML&P," "ARCO," or "Chevron" is contrary to the nature of commingled transmission of gas. That, however, is why the paper fictions in which the parties engaged are so important. ARCO reported delivering ML&P's produced gas to Chugach. ARCO reported delivering ML&P's purchased gas to ML&P. Where it is the field operator preparing those paper fictions, they take on substantial weight.

ARCO's offtake statements do not support ML&P's claimed gas allocations. Instead, these statements fully support the ALJ's conclusion that ML&P had not met its burden of proving that it allocated purchased gas to its contracts with Chugach. The fact that there is contrary evidence in the record does not change that fact because substantial evidence may exist in the face of contrary evidence. The Court affirms the ALJ's findings regarding ML&P's allocation of gas to Chugach.

## B.    Enstar

The rationale discussed above also applies to ML&P's deliveries to Enstar. The offtake statements indicate that ML&P's produced gas was provided to Enstar. For the reasons discussed above, the Court affirms the ALJ's conclusion regarding the gas allocation to Enstar.

One part of the ALJ's Enstar discussion bears further scrutiny, however. The ALJ concluded that the terms of the contracts made it physically impossible for ML&P to provide purchased gas to Enstar. The ALJ based this on his belief that Enstar's purchases from ML&P occurred "at the inlet flanges of [ENSTAR's] meter station at the beginning of the ENSTAR pipeline." The ALJ compared this to where he believed ML&P took delivery of its purchased gas: "the outlet side of certain meters at the beginning of the pipeline." He assumed, due to a lack of evidence, that ML&P took delivery of its purchased gas downstream of where it would need to deliver gas to Enstar, making it impossible for ML&P's proposed allocation to occur.

The ALJ's conclusion regarding where ML&P took delivery, however, is not clearly supported by the evidence. ML&P took delivery of its purchased gas from "the outlet side of [Shell's/Chevron's/ARCO's] meters at the Beluga River Field." The only diagram of the BRU layout indicates that there is a bank of meters in the BRU that appear before the Enstar pipeline. As these are the only meters indicated on the diagram between the well pads and the Enstar pipeline, it appears that the producers' meters are at that location. Moreover, ML&P was supposed to deliver gas to Enstar at the inlet flanges of Enstar's central meter station. That station appears to be located near Enstar's pipeline, which is located after the BRU meters. This would all appear to indicate that it would be possible for ML&P to deliver purchased gas to Enstar. In fact, DOR's witness testified that it would not be physically impossible for ML&P to sell purchased gas to Enstar.[24]

It may be that the ALJ was interpreting the field layout as he did because it was ML&P's burden to prove that the meters where it took delivery of purchased gas were located before the meters to which it would deliver gas to Enstar. If that is the case, it was not clearly explained in the ALJ's decision. Unless the ALJ's conclusions regarding where various delivery points were located was based on the fact that ML&P bore the burden in this case, the ALJ's assumptions regarding where certain delivery points were located and conclusions drawn from those assumptions are not supported in the record.

However, the ALJ's determination regarding ML&P's allocation of purchased gas to Enstar is still supported by substantial evidence, notwithstanding any potential error regarding delivery points. The ALJ found that the offtake statements

---

[24] However, the Court gives this testimony little weight because it is not clear that DOR's witness was contemplating the exact location of the metering stations when discussing whether it would be possible for ML&P to deliver purchased gas to Enstar.

demonstrated that ML&P had delivered produced gas to Enstar, leaving no reason for ML&P to then turn around and also provide Enstar with purchased gas. That conclusion independently undermines ML&P's claimed allocation if supported by substantial evidence. For the reasons discussed above, the offtake statements provide substantial evidence in support of the ALJ's conclusions regarding ML&P's failure to meet its burden to prove that it used purchased gas to satisfy the Enstar and Chugach contracts. Therefore, the Court affirms the ALJ's findings regarding ML&P's use of produced gas to satisfy its obligation to Enstar.

## C. Additional Arguments Regarding Gas Allocation

ML&P advances two other arguments in an attempt to undermine the ALJ's decision. They are discussed below. Neither alters the conclusions reached above.

### 1. The Importance of Royalty and Sales Point Delivery Statements

The ALJ briefly discusses the State's royalty reporting system which would include identification of sales point deliveries. He appears to do so because the information in the royalty reports would indicate whether ARCO and Chevron were making sales point deliveries to ML&P at Chugach's plant such that ML&P could resell that gas to Chugach, instead of delivering the purchased gas to the Enstar pipeline downstream. The parties discuss this topic extensively, including what rules governed the reporting requirements, what information would be required, whether the offtake statements can be used for royalty reporting, and the fact that ML&P had declared its reallocation efforts to DNR such that DNR knew the offtake statements did not represent ML&P's actual allocations. The record does not make clear whether the offtake statements were part of the royalty reports ARCO submitted to DNR as field operator. The importance of this discussion in the ALJ's decision is that without royalty reports, the ALJ could not tell "whether [ARCO] or Chevron made any sales point deliveries to

ML&P as a customer at point B. And one therefore cannot tell whether ML&P ever owned any purchased gas at point B that it could resell Chugach."

No matter what the royalty reporting requirements were or what they would have shown, no one appears to have provided a copy of ML&P's, ARCO's, or Chevron's royalty statements.[25] In light of the parties' failure to provide this information, the ALJ turned to the offtake statements. Nothing in the discussion of royalty reporting requirements changes the fact that neither party submitted royalty reports and the offtake statements and gas balancing statements were the only documents provided that purported to show how produced and purchased gas was distributed. Thus, the parties' arguments regarding reporting requirements do not affect the conclusions above and do not call for reversing the ALJ's decision.

## 2. Extraneous Information in the Offtake Statements

ML&P also argues that the offtake statements should not form the basis of the ALJ's decision because ARCO included information in the statements not required by the BRU owners' agreement. This argument is unpersuasive. Whether ARCO was required to show how it was allegedly distributing the purchased and produced gas as field operator makes little difference. ARCO was the field operator. ARCO's offtake statements indicate how ARCO claimed it was distributing the gas from the BRU. The fact that some of the information may not have been required under the gas balancing agreement does not render that information invalid or create less of an inconsistency in the paper record. This is not a basis for finding that the ALJ's decision was not supported by substantial evidence.

---

[25] These may have been included in the parties' response to the ALJ's request for supplemental information, but they are not properly before the Court here.

**CONCLUSION**

The Court affirms the ALJ in this administrative appeal.[26] The Court may not have resolved the issues in this case in the same manner had this been a case of first impression. The standard of review, however, is substantial evidence, and the record demonstrates that the ALJ's decision is supported by substantial evidence. This is all that is required. The Court cannot reweigh the evidence. The offtake statements uniformly indicate that ARCO, as field operator, delivered produced, not purchased, gas to Enstar and Chugach on ML&P's behalf. These statements support the ALJ's determination that ML&P failed to meets its burden to prove that it had used purchased gas to fulfill those contracts. Therefore, the Court affirms the ALJ's decision.

DATED at Anchorage, Alaska, this 25th day of August 2014.

/s/<br>
_____<br>
MARK RINDNER<br>
Superior Court Judge

---

[26] The Court does not discuss DOR's cross-appeal in light of this holding.

| In the Matter of | ) | |
|---|---|---|
| | ) | |
| MUNICIPALITY OF ANCHORAGE | ) | OAH No. 08-0395-TAX |
| d/b/a ANCHORAGE MUNICIPAL LIGHT & | ) | |
| POWER | ) | |
| | ) | |
| 1999-2005 Gas Production Tax | ) | |
| _____ | ) | |

**DECISION[*]**

## I.    Introduction

### A.    Nature of the Case

Anchorage Municipal Light and Power (ML&P) is a municipally owned electric utility that uses gas-fired turbines to produce electricity.  During the period at issue in this case, ML&P owned an interest in a nearby gas field and was a gas producer.  ML&P also purchased gas from others during this period.  And finally, ML&P was a gas seller, selling gas to two other utilities.  This case is about what kind of gas — purchased gas, or gas ML&P produced itself — was being used to supply the other utilities.

Because it is a municipal entity, ML&P is exempt from gas production tax for the gas it produces and uses in its own turbines.[1]  ML&P also has no production tax liability for gas it purchases from others (because it is not a producer with respect to that gas), regardless of whether it uses or sells the purchased gas.  ML&P is not, however, exempt from production tax with respect to gas it produces *and* sells to other utilities.

---

[*]    This decision has been edited to conform to the technical rules of the Alaska Supreme Court and for minor corrections; internal citations to the record have been omitted.

[1]    This was established in *State, Department of Revenue v. Municipality of Anchorage*, 104 P.3d 120 (Alaska 2004).

For the period from 1999 through 2005, the State of Alaska, Department of Revenue (DOR) has required ML&P to deem its sales to the other utilities to be sales from the gas ML&P produced, and to pay production tax for that gas. ML&P has done so under protest. ML&P contends that nearly all of the gas sold to other utilities was gas ML&P had purchased, not subject to further taxation. ML&P seeks a refund.

B.     Procedural History

In the summer of 2008, DOR issued a final Informal Conference Decision (ICD) rejecting ML&P's position and denying a refund of the production taxes at issue. ML&P appealed to this office. The parties immediately stipulated that the case should be tried, at least in part, through the submission of written pre-filed testimony. After discovery had closed and both sides had submitted two rounds of pre-filed testimony, they stipulated that "the parties are prepared to rest their respective cases on the evidence already submitted." The parties were to brief the case according to an agreed schedule, followed by an oral argument. There was an express provision that the Administrative Law Judge (ALJ) could, if he wished, schedule a live hearing "to pose questions to witnesses who have submitted prefiled testimony," with the scope of that hearing limited to the ALJ' s questions and related cross-examination by counsel. These arrangements were incorporated into a procedural order. Neither the stipulation nor the order contemplated the addition of different or more complete documentary evidence than what had already been supplied.

Briefing and oral argument were complete on December 20, 2010. The ALJ did not begin working closely with the voluminous evidence the parties had submitted until two years later. When he did, he was able to draft a full decision but he felt that there were gaps and ambiguities in the record on one issue, namely, where ML&P took delivery of its purchased gas. This was an important threshold question because, in order to show that it had sold only purchased gas to its utility customers,

ML&P had to show that it actually owned purchased gas to resell to those customers at the delivery points those customers had specified.

The gaps and ambiguities seemed to the ALJ — perhaps wrongly, in retrospect — to be easily resolvable.  Rather than convene a live hearing, he invited the parties to submit documents and a stipulation or affidavits addressing four problems:

- Both parties' experts had discussed a group of sample monthly "offtake statements,"[2] one from each of the seven tax years at issue.  Both experts seemed to assume that the samples were typical of the full set of offtake statements, but neither had actually said  so.  The ALJ asked to see the full set of offtake statements to confirm that they all showed the same pattern.

- The offtake statements appeared to present information that must be filed with the Department of Natural Resources (DNR) under a key reporting regulation, and ML&P had not quarreled with DOR's statements in argument that, indeed, these statements were reports to DNR.  Nonetheless, there was no actual evidence, and no foursquare stipulation, to that effect. The ALJ asked the parties to clarify what role the offtake statements played in DNR reporting and, if the offtake statements were not the official reports, to tell him how the DNR reporting requirement was fulfilled.

- The meat of the DNR reporting regulation was contained in an instructions document "incorporated by reference" into the regulation.  However, the parties seemed to have overlooked the fact that there had been two versions of the regulation, incorporating different instructions documents.  One

---

[2]    "Offtake" in this context would be the amount of gas removed from the place of production, see WILLIAMS & MEYERS, MANUAL OF OIL & GAS TERMS at 637 (7th ed. 1987), but these statements reported a broader range of information, including information on sales point deliveries.

relevant version of the regulation came into effect in 2002 and remains in effect today. Because it is still in effect, the incorporated document is still available from public sources, and the ALJ could consult it. But prior to 2002, a different regulation had been in effect incorporating a different instructions document, one apparently no longer available to the public. Since the parties had not supplied the text of this superseded law (because they are incorporated in a regulation, the instructions are law), the ALJ asked for a copy so that he would have the exact text of the law applicable to some of the earlier tax years at issue.

- ML&P had supplied a diagram of the pipelines and meter locations associated with the gas field at issue, but the diagram was clearly a gross simplification, and it did not identify the very precise delivery points specified in certain contracts ML&P was relying on to make its case. The ALJ asked for a more detailed diagram or explanation.

Since one party always has the burden on a given issue, it is never essential for adjudicators to ask clarifying questions or seek to fill gaps inadvertently left in the record. Where ambiguity persists, one can simply resolve the issue against the party with the burden, at least in the context of parties represented by counsel. There is, however, a tradition in Alaska administrative proceedings to encourage clarity, so that questions can be resolved on their merits, rather than on defects or omissions in a party's presentation.[3]

---

[3]    *E.g.*, *In re Downs*, OAH No. 10-0501-REC at 1 (Sept. 7, 2011) (ALJ requested document, which was admitted without objection); *Aetna Life Ins. v. Div. of Gen. Servs.*, OAH No. 06-0230-PRO at 2, 5 n.35 (May 25, 2006) (same); *In re Alaska Med. Dev. - Fairbanks*, OAH No. 06-0744-DHS, "Order of Remand" (May 31, 2007) (commissioner ordered proceeding reopened to receive and develop new evidence).

This process probably would have unfolded quite differently had the case been tried in a live hearing. The ALJ would have betrayed his puzzlement as the evidence came in, and the parties and witnesses would almost certainly have responded by addressing the areas that confused him. In this case, however, all of the parties' evidence was submitted before the ALJ heard or evaluated any of it. The organic give-and-take of a live evidentiary proceeding was lost.

## C. Exclusion of Clarifying Evidence

Initially, neither party objected to the requests for supplemental materials. However, in its first formal and comprehensive response a month later, ML&P began to express reservations about the process, observing that its stipulation to try the case on a written record extended only to the written record that had been submitted at the time of the stipulation, and asserting a right to discovery and cross-examination regarding the new materials being added to the record. The ALJ told the parties he thought the procedural point ML&P was making had some merit. He distributed to the parties his very tentative draft of part of a decision based on the record as a whole, including the new materials, so that ML&P could better assess what kind of additional proceedings (such as argument, cross-examination, or responsive evidence) it might desire.

In its final response on this procedural query, ML&P has unequivocally taken the position "that it is inappropriate for [Office of Administrative Hearings (OAH)] of its own motion to seek, consider, or base its decision in any way on evidence beyond the evidence that the parties have agreed must form the basis for OAH's decision." ML&P asserts that it is improper for the ALJ to "assist[] parties in developing evidence to support their positions," and expressly asks that "OAH proceed to reach a decision in this matter based on the evidentiary record of the parties' prefiled testimonies."

ML&P, which has the burden of proof on the underlying issues and bears the risk should the record be murky and unpersuasive, has always been the potential

beneficiary of the ALJ's requests for clarifying evidence. But ML&P may have good reasons for insisting that its own presentation not be augmented in any way. While it is certainly permissible for an adjudicator to try to clarify the record, particularly absent an objection from either party, at the end of the day a represented party such as ML&P, if it insists, will ordinarily be permitted to present the case it chooses to present.

Accordingly, ML&P's objection will be sustained. All of the supplemental evidence submitted by either party in response to the ALJ's requests (that is, all evidence submitted in February, 2013) is excluded.

## II.    Factual Background

### A.    ML&P's Gas Sources and Sales Obligations

In 1991, ML&P began purchasing the gas it needed for electric generation from three companies that, at that time, had working interests of one-third each in Cook Inlet's Beluga River Field. The working interest owners were Shell Western E&P, Inc. (Shell), ARCO Alaska, Inc. (ARCO), and Chevron U.S.A., Inc. (Chevron). ML&P had essentially identical contracts with each of them, in which the producer agreed to sell, and ML&P agreed to buy, one-third of ML&P's total gas requirements for electric generation. These contracts ran through December 31, 2005.

In 1996, ML&P purchased Shell's interest in the Beluga River Field for approximately $120 million. This meant that ML&P could now produce for itself the one-third of its own *requirements* that it was not obligated to purchase from ARCO and Chevron. One-third of the Beluga River Field *production*, however, exceeded one-third of ML&P's requirements, meaning that ML&P had some gas left over after making its required purchases from ARCO and Chevron and taking its own share of production. Shell had various other sales contracts in place, and ML&P succeeded to those contracts. Two of the contracts are of interest for this case. One required ML&P to supply a portion of the gas required by Chugach Electric Association, Inc. (Chugach) at its Beluga

generating facility. The other required ML&P to supply a certain quantity of gas to a subsidiary of ENSTAR Natural Gas Company (ENSTAR).

**B.	Reallocation Between Sources**

The gas that comes out of the Beluga River Field is homogenous — one cubic foot is the same as another — and the gas of the various working interest owners is entirely commingled as it leaves the field. In 1996, ML&P informed ARCO and Chevron that it intended, insofar as possible, to allocate gas it received under its purchase contracts with them to fulfill its sales contracts with Chugach, ENSTAR, and others, while allocating the gas from its own one-third interest in the Beluga River Field to its own power generation needs. This would not alter ARCO's and Chevron's obligations — each was obligated to supply an amount of gas equivalent to one-third of ML&P's generation needs — but it would simply reroute some of that gas to resale. ARCO assented and Chevron protested, and there the matter lay until 1999; ML&P did not in fact reallocate any purchased gas to resale during 1997 and 1998.

In May of 2000, ML&P declared to Chevron and Phillips Alaska Inc. (which had succeeded to the ARCO contract) that, in 1999, it had used all of the gas purchased from them, or 5.3 million Mcf, to supply more than 90 percent of its sales to Chugach and ENSTAR.[4] This was a paper allocation; there was no physical routing or rerouting of gas associated with this determination.

---

[4]	The claimed allocation was that 5.3 million Mcf of purchased gas was used in connection to sales to Chugach and ENSTAR that, at least at that time, were thought to total 5.5 million Mcf (slightly different figures for sales to Chugach and ENSTAR are suggested by later documents). The record shows that 5.3 million Mcf was 100 percent of purchased gas in 1999. The amount of this purchased gas said to have been allocated to the Chugach/ENSTAR sales was later lowered to 4.9 million Mcf, seemingly on the basis that, when month-by-month volumes are examined, the original full-year allocation claim would not be supportable, due to certain months in which sales exceeded purchases.

On February 8, 2001 (more than two years after the reallocation had purportedly begun), ML&P informed DOR of this allocation, seeking a refund of production taxes associated with the purchased gas it was allocating to Chugach and ENSTAR deliveries. On the same date, ML&P likewise informed the DNR and the Minerals Management Service (MMS) that it had been so allocating its production and purchases for the preceding two years and would continue to do so.

DNR responded that it would have no objection to the reallocation described to it, provided valuation for royalty purposes remained unchanged. Nothing in the record indicates that ML&P ever followed up and actually made the reallocation in its regulatory reports to DNR.[5]

DOR eventually denied the refund claim. In a 2004 royalty audit letter, MMS also rejected ML&P's reallocation, contending that volumes delivered to each ML&P purchaser are set by the offtake statements discussed later in this decision and that those statements were inconsistent with the reallocation.

For its part, ML&P followed the same pattern it had announced through the end of 2005, declaring, for tax purposes, a paper allocation of purchased gas, rather than gas from its own production share, as the gas to be used for the sales to Chugach and ENSTAR whenever there was sufficient purchased gas to cover the sales. The total amount of purchased gas allocated to sales was 32.5 million Mcf over the seven affected years, of which 26.3 million Mcf were said to have gone to Chugach and the balance to ENSTAR.

The ARCO and Chevron contracts expired at the end of 2005, and with them the allocation issue. Since ML&P no longer had any purchased gas to allocate, its

---

[5]   *Cf*. 11 Alaska Administrative Code (AAC) 04.040 (2013), discussed later in this decision.

sales obligations to Chugach and ENSTAR necessarily had to come from its own production, and hence these gas volumes were indisputably subject to production tax.

## III.    Issue for Resolution on Appeal

### A.    Scope of Issue Appealed from ICD

The ICD addressed a mix of assessments and claims for refund relating to tax years 1999 through 2005.  There were nominally two matters at issue for these years: whether the reallocation described above was valid, and whether ML&P's method of valuing taxable gas during certain periods was correct.  The valuation issue was of much less significance than the reallocation issue, and ML&P has not briefed it on appeal.  ML&P has pursued reversal of the ICD only on the allocation issue, and appears to accept DNR's calculation of the refund amount owing should ML&P prevail on that issue.

The ICD rejected ML&P's position on reallocation on the following basis:

> The allocation method, originally applied retroactively, is merely a mathematical reallocation that makes paper adjustments to reported volumes of gas. ML&P's paper allocation is not reflective of actual facts or events.  The Beluga field operator statements or gas delivery arrangements did not change to reflect the allocation.  ML&P has not shown that any change was made to its cost recovery requirements for RCA tariff filings.

Of particular note for this decision is the ICD's finding that ML&P did not actually deliver purchased gas and produced gas in the manner indicated in the reallocation.

### B.    ML&P's Burden of Proof

In an appeal from an ICD, the "taxpayer bears the burden of proof on questions of fact."[6]  This means that "the factual underpinnings of the assessment will

---

[6]    AS 43.05.455(c). The standard of proof is a preponderance of the evidence.
(continued...)

stand unless [the taxpayer] shows, by a preponderance of the evidence, that they are in error."[7]  As ML&P states in its final brief, ML&P's task is to demonstrate that "all the facts and circumstances support ML&P's allocation of produced gas to its own use for generating electricity."  This entails a showing that it could have, and did, deliver purchased gas to Chugach and ENSTAR in accordance with its reallocation.

## IV.  Adequacy of ML&P's Showing in Support of the Reallocation

### A.  Whether the Sales Contracts Permitted the Reallocation

A threshold question in establishing whether ML&P could have delivered purchased gas to Chugach and ENSTAR is whether such a delivery and resale was contractually permissible under the ARCO and Chevron supply contracts.  The preponderance of the evidence shows that it was.

Both supply contracts required the seller to supply, and ML&P to purchase, "gas in the amount of one-third (1/3) of ML&P's Total Gas Requirements."  What is notable about this language is that it did not commit ML&P to purchase from the seller one-third *of the gas* required for its electric generation business, but rather to purchase gas "in the amount" equal to one-third of that requirement.  Indeed, since the contracts expressly allowed ML&P to take delivery at the Chugach meters, the contracting parties clearly understood that the gas might not be used directly to fire one-third of the needs of ML&P's generation facility.  Although they evidently did not specifically foresee the precise mechanism of substitution at issue in this case, ARCO, Chevron, and ML&P did foresee, and allow for, an Mcf-for-Mcf substitution whereby a portion of the *needs* of the

---

[6]     (...continued)
Note that, although this case has been submitted on a written record, it is not in the posture of summary adjudication.  Disputed questions of fact may be, and indeed must be, resolved according to the standard of proof.

[7]     *In re Tuttle*, OAH No. 11-0176-TAX at 5 (Nov. 14, 2011).

ML&P generators in Anchorage would be delivered to the Chugach facility and used to fire generators there instead.[8] Hence, the reallocation of purchased gas to another use so that ML&P could draw on different sources for its own use was in keeping with both the language of the supply contracts and the general intent behind the language.

## B. Whether Pipeline Connections Permitted the Reallocation

With respect to deliveries to Chugach (the less significant issue of deliveries to ENSTAR is discussed later), DOR has questioned whether ML&P could physically have routed purchased gas to the Chugach facility. As a theoretical matter, ML&P has demonstrated that it could. Under the ARCO and Chevron contracts, ML&P was unconditionally allowed to take delivery of its purchased gas at "the facilities of Enstar or Chugach, at the current geographical location of the Beluga River Field."[9] Accordingly, ML&P could take ownership of the purchased gas at point B in the attached illustration, and it was possible for gas delivered to Chugach in fulfillment of ML&P's obligations to Chugach to be purchased gas.

With that said, there is a separate question of *whether ML&P has demonstrated that it did, in fact, take delivery of any purchased gas at point B*, rather than the Enstar facilities at point D. This separate question will be addressed in Section IV-D below.

---

[8] This was consistent with the parties' evident intent that the promised sales to ML&P should not be displaced (reduced) by other purchases.

One of the contracting parties, ARCO, readily agreed that the reallocation at issue in this case was consistent with its 1991 sales contract with ML&P. The other, Chevron, would not acknowledge that its own 1991 contract allowed for reallocation, but Chevron's brief communications to that effect do not provide any persuasive reasoning. Beyond a pair of perfunctory letters in the 1990s, Chevron does not seem to have sought to block the maneuver.

[9] With mutual agreement, ML&P could take delivery elsewhere as well.

C.      **The Validity of Paper Allocations**

In the ICD, DOR suggested that ML&P's allocation of its gas must be disregarded because it is purely a "paper" allocation. This view is unpersuasive. With all of the gas of the three working interest owners commingled as it came out of the Beluga River Field, paper allocation was inevitable and appropriate in this context.

For example, the allocations that DOR contends should be determinative in this case — those found in the offtake statements discussed later in this decision — are themselves paper allocations. The April 2000 offtake statement shows 2,493 Mcf delivered through the ENSTAR pipeline to the ARCO complex. All of this is attributed to ARCO's share of production, and none to ML&P's or Chevron's. And yet, one would suppose, two out of three natural gas molecules entering the ENSTAR pipeline came from ML&P's and Chevron's shares of production. It is only though paper allocation that ARCO can be deemed to have taken only from ARCO's share when it took 2,493 Mcf from the pipeline for its own use. And it is through paper allocation that the other working interest owners are compensated for that use by corresponding allocations elsewhere or, ultimately, through the Gas Balancing Agreement between the three owners.

In distribution of intermingled gases and liquids under shared ownership, paper allocation can be true allocation.[10] While it may be so that, when it declared some

---

[10]    *See, e.g.*, *People's Natural Gas Co. v. Pub. Serv. Comm'n*, 270 U.S 550 (1926) (gas volume could be added at one point in pipeline and then subtracted in equal volume at later point without changing its legal character or source, even though it was commingled during transport with gas of a different legal character or source). The *People's* holding has been limited in later cases involving complex Commerce Clause issues, but the fundamental concept that fungible commodities may be collected and redistributed by allocation remains valid.

of its gas to be used for one purpose and some for another, ML&P was simply engaging in an accounting exercise, that fact alone is not fatal to ML&P's case.

A corollary to the permissibility of paper allocation of intermingled gases and liquids is that ML&P's burden of proof in this proceeding is not as daunting as DOR contends. In DOR's view, ML&P must "show the gas deliveries happened as it claims," and that "if their claim of fungibility is true, they can't prove their case." However, an allocation case like this one is not about tracing commingled molecules along a pipeline and finding out where they went. Provided ML&P actually owned gas of the two relevant types (purchased and produced) at a given location, it could allocate the gas on paper to downstream recipients. All ML&P must prove is that it owned sufficient quantities of the relevant types of gas at that location, that the allocation it proposes is a permissible one — not barred by contract or by law — and that it took all of the relevant paper steps to make the allocation.

A second corollary of acknowledging that paper allocation can be real allocation is that the paper trail of gas volumes is important. Regulatory filings, contractual delivery points, and delivery records of particular volumes of gas may not casually be disregarded or left inconsistent with the desired allocation. In keeping with this second corollary, ML&P claims that it "comprehensively sought to structure its business and financial relationships in accordance with its allocation of gas." Sections D and E below address whether ML&P has demonstrated that the relationships were indeed structured in a way consistent with the allocation.

### D.  Deliveries to Chugach

In order to sell purchased gas to Chugach, ML&P had to own purchased gas at the delivery point set by its contract with Chugach. The delivery point under the ML&P-Chugach contract was point B in the attached illustration.

Looking upstream of that sale, it has already been noted that ML&P could take delivery of its purchased gas from the sellers (ARCO/Phillips and Chevron) at either point D or point B. Purchased gas delivered to ML&P at point D could *not* be resold to Chugach; purchased gas delivered to ML&P at point B *could* be. To show that it owned purchased gas at point B that it could allocate to Chugach sales, ML&P must show that it took delivery of purchased gas at point B.

The reporting system whereby the deliveries of the production of a field are formally designated is set by DNR's royalty-reporting regulations, 11 AAC 04.040(a).[11] The regulation in effect during the latter half of the period at issue in this case required lessees to report information called for in the *State of Alaska Oil & Gas Royalty Reporting Instructions* as they existed on September 1, 2002.[12] Of particular interest to this case, those instructions required:

> Lease owners or their designated "Operator" must submit meter run tickets, or equivalents as approved by DO&G, and supporting schedules for the gross production, net production, and all dispositions to individual lessees. Lease owners or their designated "Operator" must also report sales point deliveries when the operator makes those deliveries on behalf of lessees in the Accounting Unit.[13]

While these instructions were in effect, the owners of the working interests in the Beluga River Field had to — either themselves or through "their designated 'Operator' " —

---

[11]    At oral argument, DOR also pointed to 15 AAC 55.520(b) (2007), but that regulation did not exist during the tax years at issue in this case.

[12]    These instructions may be revised from time to time, but it is the September 1, 2002 version that has the force of regulation.

[13]    *State of Alaska Oil & Gas Royalty Reporting Instructions* (revised as of September 1, 2002), at 1-6. The full text of those instructions remains publicly on file in the location described in the Editor's Note to the regulation.

report the sales point deliveries made on their behalf by means of the filings under this regulation.

A slightly different version of 11 AAC 04.040(a), found in Register 145 of the Alaska Administrative Code, was in effect in tax years 1999 through 2001 and most of tax year 2002. Its text was identical, but it incorporated the *Instructions* as they existed on November 1, 1997. The text of these superseded instructions is no longer available from standard research sources. It is inferred that they were substantially similar to the 2002 *Instructions* because (1) no party has contended that they were different in any relevant way and (2) insofar as any of the materials filed pursuant to 11 AAC 04.040(a) are in the record, they report the same information regardless of which side of the regulatory amendment they fall on.

In the trial of this case (apart from exhibits that have been excluded pursuant to ML&P's own objection, discussed in Part I-C), ML&P did not supply a comprehensive set of its or its co-owners' filings, or those made on their behalf, under 11 AAC 04.040(a). Accordingly, one cannot tell whether ML&P actually took delivery of any purchased gas at point B. To put it another way, one cannot tell whether ARCO/Phillips or Chevron made any sales point deliveries to ML&P as a customer at point B. And one therefore cannot tell whether ML&P ever owned any purchased gas at point B that it could resell to Chugach.

There is admitted evidence in the record that suggests the contrary. The operator of the Beluga River Field[14] generated monthly statements, sometimes titled "Working Interest Agreement Statements," showing the offtake from the Beluga River Field, the amount attributable to each of the three producers, and its disposition with

---

[14] Depending on the year, this was ARCO Alaska Inc., Phillips Alaska Inc., or ConocoPhillips Alaska, Inc.

respect to the various contracts for delivery of gas from the field. Both parties refer to these as "offtake statements" or "offtake schedules," and that terminology will be followed here, although the reports do more than report the simple offtake from the field. The record contains one monthly example of an offtake statement for each of the seven tax years at issue.

The seven sample offtake statements show all of ML&P's purchased gas as delivered to ML&P at the ENSTAR pipeline.[15] All of the gas delivered to the Chugach generation facility in connection with ML&P's sales contract with Chugach is shown as ML&P production. This pattern is consistent, regardless of whether the offtake statement was created before or after ML&P announced its reallocation.

DOR took the position at oral argument that these offtake statements were filed as the official designations of deliveries under 11 AAC 04.040(a), and when ML&P's counsel responded he did not contend otherwise. There is, however, no formal stipulation to this effect.

ML&P's argument against the use of these statements has been that they are simply the allocations of the operator, not of ML&P. However, the operator would be ML&P's agent insofar as it made filings required of a lessee under 11 AAC 04.040(a). Moreover, the operator was ARCO or its successor — that is, one of the producers from whom ML&P was buying its purchased gas. The only evidence in this case indicates that the operator never purported to deliver *any* ARCO/Phillips or Chevron production to ML&P at point B, the Chugach meters.

---

[15] In addition to these seven examples, the record contains an implicit MMS determination that all of the offtake statements in 2001 were inconsistent with the reallocation ML&P sought to make in its letters sent on February 8 of that year. This is confirmation that the sample offtake statement is typical for that year with respect to the pattern of sales point deliveries.

With the evidence in this state, ML&P's unilateral, retroactive claim to DOR in 2001 and thereafter that it had reallocated gas volumes to sell purchased gas to Chugach has not been established as valid. Under the ARCO and Chevron contracts, purchased gas did not belong to ML&P until it was delivered at one of the contractual delivery points. As has been noted previously, the contracts allowed for two delivery points — either the Chugach generation facility or the ENSTAR pipeline. To the extent that any evidence at all has been offered on the issue, it suggests that in all seven years at issue ML&P *took* delivery of all of the purchased gas at the ENSTAR pipeline. Conversely, it indicates that ML&P production satisfying the ML&P obligation to Chugach was being delivered to the Chugach sales point. The 26,322,061 Mcf of purchased gas that ML&P now claims to have resold at the Chugach meters (point B in the attached illustration) in fact appear to have been delivered to ML&P at the ENSTAR pipeline (point D). Having taken delivery at the ENSTAR pipeline, ML&P could not then deliver this gas to Chugach, whose facility is upstream of that delivery point.[16] Moreover, ML&P's obligation to Chugach had apparently already been fulfilled through a sales point delivery of its own production at the Chugach meters.

To put the matter another way: ML&P was free, within contractual and legal bounds, to allocate its commingled purchased and produced gas as it saw fit. But at the inlet to the Chugach generation facility, ML&P has not shown that it had any purchased gas to allocate.

---

[16]    There is no evidence in this case to support a "backhaul" arrangement, whereby gas taken at a downstream point can be "delivered" upstream through a specific exchange agreement. *Cf. ANR Pipeline Co. v. F.E.R.C.*, 771 F.2d 507, 511-12 (D.C. Cir. 1985); *Tenn. Gas Pipeline Co. v. F.E.R.C.*, 809 F.2d 1138, 1140 n.2, 1143 (5th Cir. 1987). In any event, ML&P has not claimed any such arrangement.

### E.    Deliveries to ENSTAR

The preceding discussion covers 81 percent of the gas at issue in this case. We must then turn to the remaining 19 percent of the gas at issue, the gas ultimately destined for sale to ENSTAR. In accounting for the gas going into the ENSTAR pipeline, the operator listed ML&P's obligation to ENSTAR in a column devoted to ML&P's produced gas, again suggesting that ML&P's own production, not purchases, were destined to satisfy that obligation.

One can imagine circumstances in which the offtake statements would not have much bearing on the allocation issue with respect to the ENSTAR gas. Suppose, for example, ML&P were taking delivery of all of its produced and purchased gas at the ENSTAR pipeline inlet, and then transporting that gas (still under ML&P's ownership) down the pipeline to a later distribution point, where some would be delivered to ENSTAR as a purchaser and some to ML&P's own generation facilities. ML&P could presumably reallocate this commingled gas before committing it to subsequent destinations or buyers. But that is not how gas deliveries from the Beluga River Field were structured by contract.

Purchases by ENSTAR from ML&P occurred, not at some downstream location, but "at the inlet flanges of [ENSTAR's] meter station" at the beginning of the ENSTAR pipeline. In other words, title passed to ENSTAR at the very point ML&P's agent, the field operator, was making delivery of ML&P's production. The implication is that the operator effectively made delivery to ENSTAR on ML&P's behalf; ML&P never collected, transported, or redistributed the gas involved in the ENSTAR purchases. If the operator reported that it supplied produced gas to that location, the delivery was complete and ML&P has suggested no theory under which it could subsequently reallocate.

ML&P's *purchased* gas, on the other hand, did not become ML&P's property until "the outlet side" of certain meters at the beginning of the pipeline. In the absence of contrary evidence, one must surmise that this point is downstream of the inlet flanges of the meter station.[17] Thus it appears that ML&P did not have title to any purchased gas at the inlet flanges — it only acquired purchased gas at a downstream location — and hence it could not have resold purchased gas to ENSTAR at the location specified in its contract with ENSTAR. To allocate purchased gas to cover its sales to ENSTAR, ML&P would have had either to amend its contractual arrangements with ENSTAR or to amend its contractual arrangements for delivery of purchased gas.

The evidence regarding the ENSTAR deliveries is frustratingly ambiguous. To the extent that evidence exists, however, it suggests that the paper reallocation ML&P announced in its 2001 letter to DOR is inconsistent with formal indicia of gas ownership and allocation — the contracts and field records that show who owned gas at each point in the distribution cycle. It may be that ML&P formed an intent to reallocate and even went so far as to obtain the permission of one important regulatory party, DNR, to proceed with doing so, but then failed to follow through to perfect the arrangement.

In essence, as was the case with sales to Chugach, the record suggests that ML&P could not have sold its purchased gas to ENSTAR because it did not take delivery of that purchased gas until downstream of the point of delivery to that customer, and because it had already delivered its own produced gas to them. ML&P has not

_____

[17] The evidence in this case is equivocal, but it suggests that there is just one meter or metering station at the beginning of the pipeline. ML&P was invited to further elucidate the question of where the "outlet side" delivery point for ML&P purchases lay in relation to the "inlet flanges" delivery point for its sales to ENSTAR, but it did not do so and it objects to doing so.

carried its burden of establishing that it could, and did, distribute purchased gas as it now claims.

## V. Other Issues

DOR has argued that ML&P is barred from the allocation it proposes by several aspects of its dealings with the Regulatory Commission of Alaska (RCA) and the RCA's predecessor agency, the Alaska Public Utilities Commission. These alleged bars relate to ML&P's tariff as a utility, to the need for RCA approval of gas supply arrangements, and to representations ML&P made to the RCA and other stakeholders in connection with its acquisition of a working interest in the Beluga River Field. Addressing these arguments would involve a difficult threshold matter of the extent to which a tax tribunal should attempt to project the regulatory authority of the RCA. The RCA has authority of its own to impose a remedy should it determine that a party's gas deliveries or tax accounting has violated its obligations as a utility, and it may be in a better position to know what those obligations are. Since the failures of proof discussed earlier in this decision are fully dispositive of this case, the administrative law judge elects not to reach the remaining issues.

## VI. Conclusion

No basis has been demonstrated to disturb the assessment and denials of refund at issue. The Informal Conference Decision dated July 7, 2008 is affirmed.

DATED this 22nd day of May, 2013.

_____/s/_____

Christopher Kennedy
Administrative Law Judge
