Joyce LOPEZ, Appellant,

v.

ADMINISTRATOR, PUBLIC EM-
PLOYEES' RETIREMENT
SYSTEM, Appellee.

No. S–9294.

Supreme Court of Alaska.

April 6, 2001.

Michael J. Jensen, Law Offices of Michael J. Jensen, Anchorage, for Appellant.

Kathleen Strasbaugh, Assistant Attorney General, Bruce M. Botelho, Attorney General, Juneau, for Appellee.

Before FABE, Chief Justice, MATTHEWS, EASTAUGH, BRYNER, and CARPENETI, Justices.

*OPINION*

MATTHEWS, Justice.

## I. *INTRODUCTION*

Joyce Lopez appeals the Public Employees' Retirement Board's denial of her claim for occupational disability benefits. Lopez argues that the Board's decision was not supported by substantial evidence, that the Board applied the incorrect legal standard to its factual findings, that the Board improperly excluded Lopez's compromise agreement with the State from evidence, and that the Board improperly failed to take judicial no-

tice of the past testimony in other cases of one of Lopez's examining physicians. Because substantial evidence supported the Board's conclusion that Lopez's disability was caused by a degenerative hip condition unrelated to her work, because the Board correctly considered whether an occupational injury had been a "substantial factor" in Lopez's disability, and because the Board did not abuse its discretion in making its evidentiary decisions, we affirm the Board's decision.

## II. FACTS AND PROCEEDINGS

Joyce Lopez began work as a resident aide at the State's Harborview Developmental Center in early 1976. Her job was strenuous, as many of the center's developmentally disabled patients needed to be lifted and moved every two hours. Although Lopez endured several on-the-job injuries and suffered from chronic lower back pain, neither her injuries nor her back pain permanently affected her ability to do her job.

On April 9, 1996, however, Lopez injured her lower back while lifting a Harborview resident; she never returned to work after that injury. Lopez applied for occupational disability benefits in November 1996. Because Harborview was closing, Lopez was able to retire under a retirement incentive program while her application for disability benefits was pending. Lopez's application for occupational disability benefits was denied, but she was approved for non-occupational disability benefits on the basis of her inability to work as a resident aide and the lack of alternate employment opportunities with her employer.

Lopez appealed the denial of occupational disability benefits to the Public Employees' Retirement Board. On appeal, Lopez testified that since her injury she had suffered

from extreme pain in her back, radiating through her hip, that made it impossible for her to return to work as a resident aide. Relying on the report of one of Lopez's examining physicians, however, the Board found that Lopez's disabling pain was caused by degenerative arthritis in her hip, a condition which did not have a substantial relationship to any job hazard or incident. The Board thus rejected Lopez's appeal, finding that Lopez had not established that a condition or hazard undergone in the course of her employment was a substantial factor in causing her disability.

Lopez appealed the Board's decision to the superior court, which affirmed the Board's decision. This appeal follows.

## III. STANDARD OF REVIEW

When the superior court acts as an intermediate court of appeal, we review the agency's decision directly.[1] We review questions of law involving agency expertise under the "reasonable basis" test, where we defer to the agency's interpretation of a law unless it is unreasonable.[2] Questions of law not involving agency expertise are reviewed under the "substitution of judgment" standard.[3]

We review an administrative board's factual findings to determine whether they are supported by substantial evidence.[4] Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support [the Board's] conclusion."[5] We determine only whether such evidence exists and do not choose between competing inferences or evaluate the strength of the evidence.[6] In determining whether evidence is substantial, however, we "must take into account whatever in the record fairly detracts from its weight."[7]

1. See Handley v. State, Dep't of Revenue, 838 P.2d 1231, 1233 (Alaska 1992).

2. See id.; State, Dep't of Revenue v. Atlantic Richfield Co., 858 P.2d 307, 308 (Alaska 1993).

3. See Handley, 838 P.2d at 1233.

4. See Hester v. State, Public Emp. Retirement Bd., 817 P.2d 472, 476 (Alaska 1991).

5. Id. (internal quotation omitted, brackets in original).

6. See Handley, 838 P.2d at 1233.

7. Hester, 817 P.2d at 477 n. 8 (Rabinowitz, C.J., dissenting).

■ This court reviews the exclusion of evidence by administrative boards for abuse of discretion.[8]

## IV. DISCUSSION

### A. Substantial Evidence Supported the Board's Finding that Lopez's Disability Was Caused by a Degenerative Hip Condition Unrelated to Her Work.

■ Lopez argues that the Board's conclusion that her disability was caused by a degenerative hip condition unrelated to her work was not supported by substantial evidence. Specifically, Lopez attacks the Board's reliance on the report of an examining physician, Dr. Bryan Laycoe, contending that Dr. Laycoe's conclusions were contradicted by all of the other physicians who examined Lopez. The Public Employees' Retirement System (PERS) argues, however, that the Board was justified in relying on Dr. Laycoe's report because his conclusions were based on a thorough examination of Lopez, supported by objective evidence, and consistent with the conclusions of other doctors who examined Lopez. Our review of the record convinces us that the Board did not err in basing its conclusion upon Dr. Laycoe's report.

■ "An employee is eligible for an occupational disability benefit if employment is terminated because of a total and apparently permanent occupational disability, as defined in AS 39.35.680 . . . ."[9] Alaska Statute 39.35.680 defines an "occupational disability" as a

physical or mental condition that . . . presumably permanently prevents an employee from satisfactorily performing the employee's usual duties for an employer . . . ; however, the proximate cause of the condition must be a bodily injury sustained, or a hazard undergone, while in the performance and within the scope of the employee's duties.[10]

The conclusion that a work-related injury or hazard is not the "proximate cause" of an employee's disability must be supported by substantial evidence.[11]

We have held that an administrative agency may not reasonably base its conclusion solely upon the opinion of a doctor who did not examine the patient in any depth and disagreed with the opinions of all of the patient's treating physicians.[12] But we have also held that it is not unreasonable for an administrative board to rely upon the testimony of a reviewing physician whose testimony is consistent both with the opinion of an examining doctor and with the objective evidence.[13]

In making its findings, the Board relied most heavily on the report of Dr. Laycoe. Dr. Laycoe, an orthopedic surgeon, examined Lopez on January 11, 1997. He took a personal history, conducted a physical examination, and reviewed Lopez's previous X-rays and medical records. His examination lasted for an hour and twenty-five minutes.

Dr. Laycoe tested Lopez's range of motion in her back, but the results were not valid because of guarding. He also performed a Waddell's compression test and a rotation test, which were meant to measure whether Lopez "ha[d] . . . an emotion[al] overlay or psychological factor to treating [her] back pain." During both tests, Lopez complained of pain in her back, results which suggested that Lopez "expresse[d] more pain [in her back] than [was] truly there." The X-rays of Lopez's back showed evidence of osteoporosis, but no evidence of any significant abnormalities or degenerative changes. Dr. Ken Smith, the Division of Retirement and Benefits' reviewing physician, later testified that "osteoporosis doesn't, in itself, give pain, unless it causes fractures" and that Lopez's X-

8. See DeYonge v. NANA/Marriott, 1 P.3d 90, 94 (Alaska 2000). See also Bonneville Auto. Ins. Co. v. Insurance Div., Dep't of Commerce, 53 Or.App. 440, 632 P.2d 796, 802 (1981).

9. AS 39.35.410(a).

10. AS 39.35.680(26).

11. See Hester, 817 P.2d at 476.

12. See Black v. Universal Services, Inc., 627 P.2d 1073, 1075–76 (Alaska 1981).

13. See Childs v. Copper Valley Elec. Ass'n, 860 P.2d 1184, 1189–90 (Alaska 1993).

rays did not show evidence of any fractures. On the basis of his examination, Dr. Laycoe concluded that Lopez had not suffered a permanent back injury.

The X-ray of Lopez's hip, by contrast, showed clear evidence of abnormalities associated with degenerative arthritis. Lopez's MRI was also consistent with arthritic changes in her hip. In the absence of any objective evidence of a permanent back injury, Dr. Laycoe concluded that the pain Lopez "felt" in her back was actually referred from, and caused by, her degenerative hip. Dr. Laycoe also concluded that Lopez's hip problem, like the degenerative arthritis in the basal joints of both her thumbs, was the "natural progression of a degenerative arthritis with genetic predisposition," rather than the result of a work-related injury.

Dr. Laycoe's examination of Lopez lasted for an hour and twenty-five minutes, substantially longer than the twenty minute interview and brief examination we criticized in *Black*.[14] In addition, Dr. Laycoe's conclusions were consistent with the objective evidence of Lopez's X-rays and MRI. Although Dr. Laycoe's conclusions were contradicted by Lopez's reports of increased back pain, Lopez's complaints of back pain were not validated by her range of motion test, and her Waddell's compression test and rotation test suggested that her feelings of back pain were exaggerated.

Additionally, Dr. Laycoe's conclusions were consistent with the reports of some of the other physicians who examined Lopez. After his examination of Lopez, Dr. Michael James, like Dr. Laycoe, concluded that the X-rays of Lopez's back were within normal limits, that Lopez's MRI revealed no evidence of a degenerative back condition, and that some of Lopez's range of motion tests were invalid. After discovering an "[i]nflammatory reaction of [Lopez's] right hip ... unrelated to her industrial injury," Dr. James recommended that Lopez be placed on light duty "based upon her hip more so than her lumbar spine." Dr. Gerald Morris also examined Lopez. He concluded that Lopez's joint complaints, while not fully explained, were "consistent with inflammatory disor-

der," and did not exclude psoriatic arthritis as a possible cause. Dr. Smith did not examine Lopez himself, but did review all of her medical records. In his testimony before the Board, Dr. Smith supported Dr. Laycoe's conclusions.

Although supported by Dr. James, Dr. Morris, and Dr. Smith, Dr. Laycoe's conclusions were challenged by Dr. Leland Olkjer, Lopez's chiropractor. Dr. Olkjer testified that Lopez had not reported symptoms in, or been treated for, her hip or lower back prior to April 1996, but had experienced problems in those areas after that time. Dr. Olkjer believed that Lopez had suffered a serious back sprain in April 1996, and that her hip pain was referred from her back injury. Dr. Olkjer thus concluded that Lopez's disability was caused by her April 1996 work injury.

But Dr. Olkjer's testimony was contradicted by other facts in the record. Dr. James reported that Lopez had received chiropractic treatment for lower back pain for the past twelve years. Dr. Olkjer denied that he had provided that care. However, when asked whether she had received chiropractic care for lower back pain over the past twelve years, Lopez herself testified that she had received such care. Having heard Dr. Olkjer's testimony, Dr. Smith did not change his opinion that Lopez's disability was caused by her arthritic hip rather than by her 1996 injury or a degenerative back condition.

Dr. Olkjer was the only medical expert whose opinion *clearly* contradicted Dr. Laycoe's. Dr. Steven Tower's original one-page report stated that the "probable cause" of Lopez's hip pain was "lifting residents." Dr. Coyle felt that Lopez's MRI possibly represented some local trauma to the hip or a possible stress fracture. Dr. Kathleen Todd stated that Lopez's 1996 injuries "were the predominant cause for her right hip and low back condition," but qualified that statement by noting that she had not seen or even spoken to Lopez for three months, and that "[her] evaluation at that time was based quite extensively on what [Lopez] said that the doctors in Anchorage said, so is really hearsay, and not [her] own observation."

14. 627 P.2d at 1076 n. 9.

■ Lopez briefly argues that if her disability was in fact caused by an arthritic hip, the Board erred by failing to rule out the possibility that her arthritis had been caused by her work. Unlike the employees in the workers' compensation cases that Lopez cites in support of her argument, however, Lopez bore the burden of proving a relationship between her work and her disability.[15] Until her brief before the superior court, Lopez never argued that her work bore any relationship to her degenerative hip condition. The uncontradicted evidence before the Board was that Lopez's hip condition was not caused by her work. The Board's finding that Lopez's hip problems were not caused by her work was thus supported by substantial evidence.

Dr. Laycoe's conclusions were not only the product of a thorough examination, but were also consistent both with the objective evidence and with the reports of some of Lopez's other examining doctors. Accordingly, his report provided the substantial evidence needed to support the Board's conclusion that Lopez's disability was caused by a degenerative hip condition unrelated to her work.

B. *The Board Applied the Correct Legal Standard in Considering Whether an Occupational Injury Was a "Substantial Factor" in Lopez's Disability.*

Lopez also argues that the Board applied the incorrect legal standard in denying her claim for occupational disability benefits. Highlighting the Board's factual finding that her 1996 injury "was not so significant *in and of itself* to have been a substantial factor in her current state of disability," (emphasis added) Lopez contends that the Board erred as a matter of law either by requiring her to prove that her 1996 injury was the sole cause of her disability, or by requiring her to prove that her 1996 injury worsened her underlying condition rather than merely worsening its symptoms. PERS contends, however, that

the Board only required Lopez to prove that her work-related injuries were a "substantial factor" in her disability. Upon review, we find that the Board correctly required Lopez to prove only that a work-related injury or condition was a "substantial factor" in her disability.

■ An employee will be eligible for occupational disability benefits if a work-related injury or hazard is the "proximate cause" of a disability that prevents her from working.[16] In *State, Public Employees' Retirement Board v. Cacioppo,* we held that "[i]f one or more possible causes of a disability are occupational, benefits will be awarded where the record establishes that the occupational injury is a *substantial factor* in the employee's disability regardless of whether a nonoccupational injury could independently have caused disability." [17] In *Hester,* we further held that a work-related injury can be a "substantial factor" in an employee's disability if it aggravates the symptoms of an underlying health condition, even if it has no effect on the underlying health condition itself.[18]

■ Correctly citing *Cacioppo* as the controlling legal authority, the Board found that Lopez's 1996 injury simply masked the ongoing referral of pain from her degenerating hip, that Lopez was not suffering from a degenerative back condition, and that the cause of Lopez's disability was the degenerative arthritis in her hip, which had no substantial relationship to any job hazard or incident. The Board did not, in other words, find that Lopez would have been disabled *either* by her arthritic hip or by her back, but instead found that the *sole* cause of Lopez's disability was her arthritic hip. Accordingly, because not even "one … possible cause[ ] of [Lopez's] disability was occupational," [19] the Board correctly applied our holding in *Cacioppo* in finding that Lopez's occupational injury was not a substantial factor in her disability.

---

15. *See State, Pub. Emp. Retirement Bd. v. Cacioppo*, 813 P.2d 679, 682–83 (Alaska 1991).

16. *See* AS 39.35.410(a); AS 39.35.680(26).

17. 813 P.2d at 683 (emphasis added).

18. 817 P.2d at 475.

19. *Cacioppo*, 813 P.2d at 683.

Although a work-related injury can be a "substantial factor" in a disability if it aggravates the symptoms of an underlying health condition, the injury must have a causal connection to the worsening of those symptoms for the injury to "aggravate" them.[20] The Board found, however, that the lasting pain Lopez experienced after her 1996 injury was caused by her hip problems rather than by the injury, and that the 1996 injury simply served to "mask"—rather than to aggravate—the ongoing referral of pain from Lopez's degenerating hip. Because the 1996 injury did not *cause* the "aggravated symptoms"—the lasting and severe pain—that disabled Lopez, the Board did not err in finding that the 1996 injury was not a "substantial factor" in Lopez's disability.

### C. The Board Did Not Abuse Its Discretion by Excluding the Compromise and Release Agreement from Evidence.

Lopez also contends that the Board erred by not admitting into evidence the compromise and release agreement reached between Lopez and the State (her former employer). Lopez argues that because it was contrary to the State's interests for it to admit that Lopez's disability was work-related, the agreement was reliable enough to be considered by the Board. PERS argues, to the contrary, that the agreement represented nothing more than a compromise settlement of a disputed claim, and was thus not the kind of evidence upon which the Board could have responsibly relied. We find that the Board did not abuse its discretion in excluding the compromise agreement from evidence.

The rules governing the hearing before the Board state:

The hearing will not be conducted according to technical rules relating to evidence and witnesses. Relevant evidence, including hearsay evidence, will be admitted if it is evidence on which responsible persons are accustomed to rely in the conduct of serious affairs. Irrelevant and unduly repetitious evidence will be excluded or curtailed.[21]

Although hearings before the Board are governed by 2 AAC 35.160(c) rather than by the Alaska Rules of Evidence, both parties appeal to the rules as persuasive authority. Lopez contends that the agreement was reliable either as an admission by a party opponent (Evidence Rule 801(d)(2)), or as a statement against interest (Evidence Rule 804(b)(3)). PERS argues, to the contrary, that the compromise agreement was, by its own terms, an unreliable compromise agreement (Evidence Rule 408).

Rules 801(d)(2) and 804(b)(3) both provide exceptions to the general bar on hearsay. Rule 801(d)(2) states that hearsay does not include admissions by a party opponent or a party opponent's agent. But we have held that because PERS and the State (as an employer) are not in privity, the State's actions do not bind PERS as would the acts of one of PERS's agents.[22]

Where a declarant is unavailable, Rule 804(b)(3) provides an exception to the hearsay rule for a

statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil ... liability, ... that a reasonable person in the declarant's position would not have made the statement unless believing it to be true.

Regardless of the statements it makes, however, the State bears broad potential liability to a disabled worker under workers' compensation law, where compensability is presumed.[23]

Evidence Rule 408 bars the introduction of "[e]vidence of ... offering ... a valuable consideration in compromising ... a

---

**20.** *See Hester,* 817 P.2d at 475.

**21.** 2 AAC 35.160(c).

**22.** *See Holmberg v. State, Div. of Risk Management,* 796 P.2d 823, 827–29 (Alaska 1990) (finding no privity, and therefore no collateral estoppel effect to PERS decisions in workers' compensation proceedings, because "[t]he PERS constituency is not represented at all in a workers' compensation proceeding").

**23.** *See Hester,* 817 P.2d at 476.

[disputed] claim ... to prove liability for or invalidity of the claim," and also bars "[e]vidence of conduct or statements made in compromise negotiations." Rule 408 is meant both to facilitate the settlement of disputes, and to bar the introduction of irrelevant evidence reflecting "a desire for peace rather than ... any concession of weakness of position." [24] Rule 408 clearly bars admission of a compromise between the litigant and a third party *against* a litigant, as litigants would be less willing to make compromises with third parties if those compromises could be used against them in later litigation.[25] Unlike introduction of a settlement agreement with a third party *against* a litigant, however, permitting a litigant to introduce evidence of his or her *own* compromise with a third party generally should not be a deterrent to settlement.[26] But in such a case the compromise settlement is still ordinarily of little probative value, reflecting, not the litigant's, but the *third party's* desire for peace rather than any concession of a weak position.

The agreement contains a lengthy recitation of facts about Lopez's injury, taken from Lopez's medical reports. To settle Lopez's controverted workers' compensation claims, the State agreed to pay her $20,000 in exchange for a release from future liability. Lopez argues, and the State implicitly concedes, that various elements of the agreement represent "admissions" by the State that Lopez's disability was caused by a work-related injury.

The facts about Lopez's disability are the most relevant part of the agreement. But those facts merely repeat the information contained in the medical reports already before the Board. Admission of this portion of the agreement would thus be "unduly repetitious." [27]

What makes the agreement unique is the State's admission that Lopez's disability was caused by a work-related injury. But the reliability of that admission is suspect for three reasons. First, the agreement's reliability is not secured by its being an admission of a party opponent or a party opponent's agent. The State, of course, was not a party to this case. Moreover, the State is not PERS's agent, and so the admissions of the State cannot be attributed to PERS.[28] It is not insignificant, too, that no representative of the State could have testified as an "author" of the agreement. Lopez does not rebut PERS's assertion that the agreement was actually authored by Lopez's counsel.

Second, the State's admission of liability was not "so far contrary" to the State's interests as to make the agreement reliable. Most obviously, use of this admission *against the State* in a subsequent proceeding would be barred by Evidence Rule 408. In addition, under workers' compensation law, the State already faced a presumption that Lopez's injury had been caused by a work-related incident.[29] In the face of such a presumption, contesting Lopez's claim was certain to be costly. At the time of settlement, then, conceding the work-relatedness of Lopez's disability for settlement purposes was not "so far contrary to the [State's] pecuniary ... interest," and did not "so far tend[ ] to subject the [State] to civil ... liability," [30] that reasonable people would not have made the concession unless they believed it to be true.

Third, the State had a substantial financial incentive to settle Lopez's disputed claims. Although the claim was controverted at the time of settlement, the State was still paying Lopez $361.33 a week in vocational rehabili-

**24.** Commentary to Evidence Rule 408.

**25.** *See McInnis v. A.M.F., Inc.,* 765 F.2d 240, 247 (1st Cir.1985).

**26.** *See Bulaich v. AT & T Information Systems,* 113 Wash.2d 254, 778 P.2d 1031, 1036 (1989); 23 Charles A. Wright & Kenneth W. Graham, Jr., Federal Practice & Procedure: Evidence § 5303, at 194 (1980). *But see Pierce v. F.R. Tripler & Co.,* 955 F.2d 820, 828 (2d Cir.1992) (barring admission of settlement agreement even when

offered by settlor, noting that testimony as to terms of settlement agreement by lawyers involved would prevent those lawyers' representation of the parties at trial).

**27.** *See* 2 AAC 35.160(c).

**28.** *See Holmberg,* 796 P.2d at 827–29.

**29.** *See Hester,* 817 P.2d at 476.

**30.** Alaska R. Evid. 804(b)(3).

tation benefits. Admitting liability relieved the State from this continuing financial obligation. Moreover, the costs of the settlement were relatively low, representing only fourteen weeks of PPI benefits plus rehabilitation benefits for an additional thirty-seven weeks. The reliability of such a compromise settlement is similarly low, for it could easily represent the State's desire to buy peace rather than an acknowledgment of a weak position.[31]

 Lopez also implicitly argues that this court should discount Dr. Laycoe's testimony because these decisions reveal his pro-PERS bias. PERS argues, in reply, that Dr. Laycoe's credibility was a matter for the Board's determination rather than this court's. Lopez's attempt to reopen the question of Dr. Laycoe's credibility is unavailing: "Weighing the evidence is the role of the board, not this court."[32]

Because the relevant portions of the agreement were unduly repetitious, and its unique aspects were unreliable, the Board did not abuse its discretion in excluding the agreement from evidence.

 D. *The Board Did Not Err by Not Taking Judicial Notice of Alaska Workers' Compensation Board Decisions in Which Dr. Laycoe's Opinions Were Reported.*

Lopez argues that the Board should have taken judicial notice of Dr. Laycoe's previous pro-employer testimony in reported decisions of the Alaska Workers' Compensation Board. PERS argues, in reply, that Lopez failed to present this evidence to the Board, and that the Board thus did not err in failing to take judicial notice of it.

The rules applicable to the proceeding before the Board do not discuss the issue of judicial notice; instead, they provide general-

ly for the admission of relevant, reliable, and non-repetitious evidence.[33] Under the Rules of Evidence, a judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within Alaska or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.[34] A court *may* take notice of such facts whether or not it is requested to do so.[35] A court *must* take notice of such facts "if the requesting party furnishes sufficient information and has given each party notice adequate to enable the party to meet the request."[36]

 Lopez first requested judicial notice of Dr. Laycoe's prior testimony in her brief to the superior court. As Lopez made no request for judicial notice to the Board, the Rules of Evidence would not have required the Board to take such notice.[37] The Board thus did not abuse its discretion by failing to take judicial notice of Dr. Laycoe's past testimony.

## V. CONCLUSION

Because the Board applied the correct legal standard in concluding that Lopez was disabled by a degenerative hip condition unrelated to her work—a conclusion supported by substantial evidence—and did not abuse its discretion in its evidentiary rulings, we AFFIRM the Board's decision.

---

**31.** *See* Commentary to Evidence Rule 408.

**32.** *Hester,* 817 P.2d at 477 (rebutting appellant's contention that the administrative board "gave inordinate weight to the testimony of [a doctor], considering his bias as a member of the DRB, his lack of personal medical knowledge of [appellant] and his lack of special expertise relating to [appellant's disorder].").

**33.** *See* 2 AAC 35.160(c).

**34.** *See* Alaska R. Evid. 201(b).

**35.** *See* Alaska R. Evid. 201(c).

**36.** Alaska R. Evid. 201(d).

**37.** *See id.*