*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| SUNNY RADEBAUGH, | ) | |
| | ) | Supreme Court No. S-15814 |
| Appellant, | ) | |
| | ) | Superior Court No. 3AN-13-07629 CI |
| v. | ) | |
| | ) | O P I N I O N |
| STATE OF ALASKA, | ) | |
| DEPARTMENT OF HEALTH & | ) | No. 7178 – June 9, 2017 |
| SOCIAL SERVICES, DIVISION OF | ) | |
| SENIOR & DISABILITIES | ) | |
| SERVICES, | ) | |
| | ) | |
| Appellee. | ) | |
| _____ | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Kevin M. Saxby, Judge.

Appearances: Goriune Dudukgian and Carlos Bailey, Alaska Legal Services Corporation, Anchorage, for Appellant. Kathryn Vogel, Assistant Attorney General, Anchorage, and Craig W. Richards, Attorney General, Juneau, for Appellee.

Before: Stowers, Chief Justice, Winfree, Maassen, and Bolger, Justices. [Fabe, Justice, not participating.]

STOWERS, Chief Justice.

## I. INTRODUCTION

Sunny Radebaugh, a Medicaid in-home nursing care benefits recipient, had those benefits terminated by the Department of Health and Social Services following an

annual assessment. The assessment concluded that Radebaugh's physical condition had materially improved to the point where she no longer required the benefits. She challenged the termination of her benefits at an administrative hearing, and the nurse who performed the assessment did not testify. Following the hearing, the administrative law judge determined that the Department erroneously terminated her benefits. The Department, as final decision maker, reversed the administrative law judge's determination and reinstated the decision to terminate Radebaugh's benefits. Radebaugh appealed to the superior court, which first determined that the Department had violated her due process rights but then reversed itself and upheld the Department's decision.

Radebaugh contests both her inability to cross-examine the nurse who performed the annual assessment and the Department's reversal of the administrative law judge's determination. We conclude that Radebaugh waived the right to challenge her inability to cross-examine the nurse who performed the assessment, and we hold that the agency sufficiently supported its final decision. We therefore affirm the superior court's affirmance of the Department's final decision.

## II. FACTS AND PROCEEDINGS

### A. Facts

The Department of Health and Social Services, Division of Senior and Disabilities Services, which operates the Alaska Medicaid program,[1] offers Home and Community-Based Waiver services that provide disabled Alaskans with in-home care services as an alternative to institutionalization.[2] Waiver services are available to adults

---

[1]    *See* AS 47.07.040.

[2]    7 Alaska Administrative Code (AAC) 130.205 (2010).

with physical disabilities who require a nursing facility level of care.[3] In order to require a nursing facility level of care, an individual must have either skilled or intermediate nursing care needs.[4]

The Department uses a diagnostic tool known as the Consumer Assessment Tool (CAT) to annually assess individuals' eligibility for waiver services.[5] The CAT is a federally approved, standardized questionnaire that records an individual's medical

---

[3]     7 AAC 130.205(d) ("For the department to determine whether an applicant is eligible to receive home and community-based waiver services under this section, the applicant must be found eligible for one of the following recipient categories: . . . (4) older adults or adults with physical disabilities; to qualify for this recipient category the applicant must require, as determined under 7 AAC 130.215, a level of care provided in a nursing facility and must be . . . 65 years of age or older.").

[4]     7 AAC 130.215 ("The department will determine an applicant's level of care as follows[:] . . . (4) for the recipient category of older adults or adults with physical disabilities, the department will determine . . . whether . . . the applicant requires a level of care provided in a skilled nursing facility; or . . . requires a level of care provided in an intermediate care facility."). Radebaugh does not claim to require skilled nursing services but claims that she requires intermediate nursing services, which are defined under 7 AAC 140.510(b):

> [T]he observation, assessment, and treatment of a recipient with long-term illness or disability whose condition is relatively stable and where the emphasis is on maintenance rather than rehabilitation, or care for a recipient nearing recovery and discharge whose condition is relatively stable but who continues to require professional medical or nursing supervision.

According to 7 AAC 140.510(a), "The department will pay an intermediate care facility for providing the services described in (b) . . . of this section if those services are . . . needed to treat a stable condition [and] ordered by and under the direction of a physician . . . ."

[5]     7 AAC 130.213(d); 7 AAC 160.900(d)(6) (incorporating the CAT by reference); AS 47.07.045(b)(1) (requiring annual assessment).

conditions, functional abilities, cognitive abilities, behavioral problems, nursing needs, therapies, and treatments.[6] The CAT is typically administered by a licensed nurse employed by the Department. The Department determines, based on the results of the CAT assessment, whether an individual is approved for or disqualified from receiving waiver services.[7] Once approved, an individual is disqualified from the program if his or her "condition has materially improved since the previous assessment,"[8] meaning that the individual "no longer has a functional limitation or cognitive impairment that would result in the need for nursing home placement, and is able to demonstrate the ability to function in a home setting without the need for waiver services."[9]

One way to qualify for a nursing facility level of care is to require extensive assistance with activities of daily living. The CAT lists five activities of daily living that are relevant to the level of care determination: eating, bed mobility, toileting, transfers,[10]

---

[6] 7 AAC 160.900(d)(6); 42 U.S.C. § 1396r(b)(3)(A) (2012) (stating requirements for assessments of nursing facility residents); 42 C.F.R. § 441.353(c)(6) (2016) (requiring states to create an instrument for "evaluation and reevaluation of waiver beneficiaries" that is "the same or more stringent" as that used to evaluate nursing facility residents).

[7] 7 AAC 130.215(4) ( providing that an applicant's required level of care is determined "based on the results of the department's [CAT assessment] . . . whether . . . the applicant requires a level of care provided in a skilled nursing facility . . . or . . . a level of care provided in an intermediate care facility").

[8] AS 47.07.045(b)(3). *See* 7 AAC 130.219(e) ("The department will disenroll a recipient [if] . . . the recipient is no longer eligible for services because the recipient's reassessment . . . indicates the condition that made the recipient eligible for services has materially improved since the previous assessment.")

[9] AS 47.07.045(b)(3)(C).

[10] According to the CAT transfers occur when a person moves between
(continued...)

and locomotion. Each activity is scored from 0-4, with 0 representing that the individual is entirely independent, 1 indicating that the individual requires caregiver supervision only, 2 indicating that the individual requires limited assistance with the activity,[11] 3 indicating that the individual requires extensive assistance with the activity,[12] and 4 indicating total dependence on the caregiver when completing the activity.[13] To qualify as needing nursing facility level of care based on activities of daily living alone, an individual would need to score a 3 or 4 on at least three out of the five daily activities. Another way to qualify for waiver services is to require qualifying therapy three or four days per week in addition to limited one-person physical assistance for two of the five activities of daily living.

Sunny Radebaugh was a 70-year-old woman with a number of disabilities that made it impossible for her to live independently. She had difficulty performing routine daily tasks such as standing, walking, sitting, and transferring to and from the sitting or lying position. In January 2005 the Department assessed Radebaugh with the CAT and found that she qualified for waiver services. Karen Mattson, the nurse who performed the CAT assessment, determined that Radebaugh was eligible for waiver services based on Radebaugh's functional limitations. The 2005 CAT assessment

[10](...continued) surfaces, including moving to and from bed, chairs, wheelchairs, and a standing position; moving to and from the toilet is not included as a transfer but rather as toileting.

[11]     "Limited assistance" is defined by the CAT as receiving physical help or other nonweight-bearing assistance more than three times, or physical help plus weight-bearing assistance one to two times over the past seven days.

[12]     "Extensive assistance" is defined by the CAT as requiring weight-bearing support or full caregiver performance three or more times over the past seven days.

[13]     "Total dependence" requires full caregiver performance of the activity for the past seven days.

indicated that Radebaugh was totally dependent for her transfers and required extensive assistance for her bed mobility, locomotion, and toilet use.

The annual reassessments conducted in 2007 through 2012 all found that Radebaugh's condition had materially improved and, therefore, she did not qualify for waiver services. In the 2012 CAT assessment, Mattson indicated that Radebaugh required no assistance for her bed mobility and only setup assistance for her eating. Mattson next reported that Radebaugh required limited assistance for her transfers: Radebaugh stated that she used her walker, and Mattson noted that Radebaugh's personal care assistant put "weight on [the] walker while [Radebaugh] independently got herself out of bed and with cues from [her personal care assistant] unlocked and locked [the] brakes." Next, Mattson indicated that Radebaugh required limited assistance with her locomotion: Radebaugh reported that she used her walker indoors, and Mattson observed, "[O]nce [Radebaugh] was steady, she took deliberate slow steps to ambulate to the table . . . with [her personal care assistant] cueing her along the way [i.e.] 'pick up your feet[,]' 'remember to use the brakes.' " The CAT assessment also indicated that Radebaugh required limited assistance with her toileting, notably assistance balancing as she transferred to and from the toilet. Finally, the CAT assessment indicated that Radebaugh did not attend physical therapy with a qualified therapist. The 2012 CAT assessment indicated that Mattson reviewed her findings with Radebaugh and Ella Savage, Radebaugh's personal care assistant.

Based on her observations, Mattson concluded that Radebaugh required neither skilled nursing care nor intermediate nursing care; Radebaugh required only "custodial care," which Mattson defined as "assistance with 'activities of daily living' such as bathing, dressing, eating, going to the bathroom, using eye drops, moving around and getting into and out of bed."

**7178**

Following a CAT assessment, the Department conducts a review of the assessment. Sam Cornell, RN, reviewed Radebaugh's CAT assessment and agreed with Mattson's conclusions. After the Department concluded that Radebaugh was no longer eligible for waiver services, that determination was sent for independent review by Qualis Health, the State's third-party reviewer. The Qualis Health review sought to ensure that the narrative information and the clinical diagnoses matched the scoring on the CAT; the review did not consist of an independent physical evaluation. The CAT assessment was reviewed by two nurses at Qualis Health; both agreed that Radebaugh no longer qualified for waiver services.

The Department then notified Radebaugh that her waiver services would be terminated unless she requested a fair hearing, which she did.

## B.    Proceedings

An administrative law judge (ALJ) conducted a fair hearing in April 2013. Radebaugh offered two witnesses: her treating physician, Dr. Wade Erickson, and her personal care assistant, Ella Savage. Dr. Erickson testified that Radebaugh's degenerative disc disease had regressed over time, which negatively impacted her ability to function, and that she had been in a "slow, steady decline." He testified that while he had seen Radebaugh get up out of chairs with assistive devices, having someone to help her would "facilitate that much easier." And while Dr. Erickson testified that Radebaugh "may have difficulty with getting her legs moving early in the morning," he also testified that she "moves better once she gets going" and "gets limbered up." Dr. Erickson testified that Radebaugh required physical therapy, but he could not say whether that physical therapy required an actual physical therapist.

On direct examination, Dr. Erickson stated that Radebaugh qualified for intermediate nursing services. He explained that "she requires supervision for maintaining her current level of function. I don't believe anywhere in that statute does

it say what type of nursing or what type of monitoring there is, and so I think that she would qualify." But on cross-examination Dr. Erickson testified that he did not "believe that [Radebaugh] needs an RN or that type of a license to supervise her per se, but she does need somebody to assist her with her activities." He agreed that a personal care assistant would satisfy his recommendations for Radebaugh.

Ella Savage, Radebaugh's personal care assistant and certified nursing aide, testified that she had been working with Radebaugh for about ten years.[14] Savage testified that she helped Radebaugh motivate, did her laundry, vacuumed, helped with transfers, helped her get to the toilet, helped her do her physical therapy, and either supported her weight while she walked around the house or reminded her to pick up her feet as she used her walker. Savage testified that helping Radebaugh with transfers required her to bear Radebaugh's weight, although Radebaugh did have "good days where [Savage] [did not] have to lift her up as much." But she made clear that she "certainly [did] have to use weight-bearing to pick [Radebaugh] up. . . . [F]or the most part [Savage] [did] the lifting."

Regarding locomotion, Savage testified that she "either walk[s] with [Radebaugh] [while] supporting her weight, or here lately [they've] been using her walker. [Savage] get[s] her to the walker and [Savage] walk[s] behind her and remind[s] her to pick up her leg, because she drags her right leg." Savage estimated that she had to physically pick up Radebaugh's leg at least six to ten times per week. Savage stated that she physically helped Radebaugh with her toileting by both physically bearing her weight as she got onto the toilet and by assisting her while she used the toilet. Savage also testified that Radebaugh went to physical therapy in Wasilla three days per week.

---

[14]     This appeal concerns only in-home nursing care services through the waiver program. After these services were terminated, Savage continued to provide personal care services to Radebaugh through the personal care program.

The Department offered two witnesses. Sam Cornell, a nurse from the Department who reviewed the CAT assessment, testified. He stated that he uses the CAT assessment to determine whether an individual qualifies for waiver services, but he also testified that he had never met Radebaugh or spoken to her doctor. He noted that by 2012 Radebaugh "had acquired her lift chair[,] and she was using a walker and stand-by assist for [walking]." He concluded that there was nothing in Radebaugh's records that would support the claim that she required intermediate nursing facility care.

Grace Ingrim, a nurse from Qualis Health, did not participate in Radebaugh's initial review but wrote an addendum to that review based on additional documents submitted later, including records of office visits with Dr. Erickson and other physicians. Ingrim found in the addendum that the records should not affect Qualis's determination that Radebaugh did not qualify for waiver services. Ingrim testified that she typically evaluates all of the information provided to determine whether an individual requires intermediate nursing level of care. Ingrim testified regarding Radebaugh's CAT assessment: "Services that are being rendered have changed, which have resulted in improved functionality in some of her scoring." She could not point to anything specific in Radebaugh's medical records to support that statement.

Mattson did not testify because she was no longer employed by the Department and had left Alaska. Radebaugh also did not testify. Numerous medical records and each of Radebaugh's CAT assessments since 2005 were part of the administrative record.

The ALJ reversed the Department's initial termination decision. He credited Radebaugh's witnesses and found that the Department's evidence was relatively weak because Mattson did not testify and was not available for cross-examination. The ALJ also discounted the Department's reliance on the fact that Mattson's previous CAT assessments had declared Radebaugh ineligible for waiver services, noting that

Radebaugh had no opportunity to challenge those assessments in a fair hearing.

The Department[15] rejected the ALJ's determination and affirmed the Department's initial decision to terminate Radebaugh's waiver services.[16] The Department's final decision declared that the ALJ "fail[ed] to give proper weight to the CAT assessment and third-party independent review while giving excessive weight to the testimony of Ms. Radebaugh's witnesses." The Department concluded: (1) the ALJ failed to account for the eyewitness observations and impressions of the nurse who completed the CAT assessment; (2) the independent reviews of the Department's termination decision considered "more than just the scores from the CAT assessment"; and (3) Radebaugh did not challenge the CAT's methodology and the CAT assessment was therefore entitled to "consideration and weight."

Radebaugh appealed the final agency determination to the superior court. The court initially determined that the Department violated Radebaugh's "fundamental [due process] right to cross-examine the author of her 2012 CAT [assessment], upon which [the Department] relied as a basis for its termination decision." But after the Department's motion for rehearing, the superior court reversed its order and held that Radebaugh's due process rights were not violated. It noted that neither party was able

---

[15] The Department's Modification and Adoption of Proposed Decision was issued by the Executive Director of the Office of Rate Review, pursuant to a delegation from the Commissioner of Health and Social Services.

[16] *See* AS 44.64.060(e) ("The agency with authority to make a final decision in the case retains agency discretion in the final disposition of the case and shall . . . do one or more of the following: . . . (4) in writing, reject, modify, or amend a factual finding in the proposed decision by specifying the affected finding and identifying the testimony and other evidence relied on by the agency for the rejection, modification, or amendment of the finding, and issue a final agency decision.").

to compel Mattson to testify at the fair hearing and that the Department was statutorily authorized to summarily reverse the ALJ. Radebaugh appeals.

## III. STANDARD OF REVIEW

"When the superior court is acting as an intermediate court of appeal in an administrative matter, we independently review the merits of the agency or administrative board's decision."[17] "We review an administrative board's factual findings 'to determine whether they are supported by substantial evidence,' which is defined as 'such relevant evidence as a reasonable mind might accept as adequate to support the Board's conclusion.' "[18] "We determine only whether such evidence exists and do not choose between competing inferences or evaluate the strength of the evidence. In determining whether evidence is substantial, however, we must take into account whatever in the record fairly detracts from its weight."[19]

## IV. DISCUSSION

Radebaugh argues that the Department violated her due process rights in two ways: (1) by failing to present Mattson for cross-examination at the administrative hearing and (2) by reversing the ALJ's credibility determinations without sufficient explanation. We conclude that Radebaugh waived her right to challenge her inability to cross-examine Mattson and that the Department adequately supported its final agency decision to terminate Radebaugh's waiver services.[20]

---

[17] *Shea v. State, Dep't of Admin., Div. of Ret. & Benefits*, 267 P.3d 624, 630 (Alaska 2011).

[18] *Id.* (quoting *Lopez v. Adm'r, Pub. Emps.' Ret. Sys.*, 20 P.3d 568, 570 (Alaska 2001)).

[19] *Id.* (quoting *Lopez*, 20 P.3d at 570.)

[20] The Department additionally argues that Radebaugh's case is moot, but we
(continued...)

**A.** **Radebaugh Waived Her Right To Challenge Her Inability To Cross-Examine Mattson At The Administrative Hearing.**

Radebaugh argues that her inability to cross-examine Mattson, the nurse who performed the CAT assessment, violated her right to due process. The Department responds that Radebaugh waived her right to challenge that process, and we agree. "[F]ailure to make the appropriate objection during the hearing waives the right to appeal procedural errors."[21]

Radebaugh did not object to the admission of the CAT assessment at the agency hearing, and she did not object to Mattson's absence. Rather than raise due process claims based on her inability to cross-examine Mattson, Radebaugh instead argued that Mattson's absence detracted from the relative weight of the Department's evidence. In post-hearing briefing, for instance, she claimed that "[n]o nurse who performed any of Ms. Radebaugh's assessments testified or was subject to cross-examination. As a result, the testimony presented by Ms. Radebaugh's witnesses is more probative than the CAT[] [assessments]." Only in superior court did Radebaugh argue that "there was no possible way that [she] could demonstrate that the scores she received on the CAT were erroneous" because Mattson was not subject to cross-examination and that this violated due process. Thus, Radebaugh failed to preserve her due process challenge to her inability to cross-examine Mattson.

But an argument not explicitly raised by an appellant below may nevertheless be considered on appeal "if the issue is (1) not dependent on any new or

---

[20](...continued)
do not reach that issue and affirm the Department's final agency decision on the merits.

[21]     *Williams v. Abood*, 53 P.3d 134, 148 (Alaska 2002) (rejecting due process argument that was not properly preserved during Workers' Compensation Board hearing); *see also Calvert v. State, Dep't of Labor & Workforce Dev., Emp't Sec. Div.*, 251 P.3d 990, 1006 (Alaska 2011).

controverted facts; (2) closely related to the appellant's trial court arguments; and (3) could have been gleaned from the pleadings."[22]

The first prong is clearly satisfied: the issue is not dependent on new or controverted facts because both parties agree that Mattson was not available for cross-examination at the administrative hearing. But Radebaugh does not satisfy the second prong. She argues that her due process claim is closely related to her hearing argument that her inability to cross-examine Mattson at the administrative hearing should negatively impact the weight assigned to the CAT assessment. Those two arguments, however, are not closely related. Rather than arguing that she had been disadvantaged by her inability to cross-examine Mattson, Radebaugh sought to capitalize on Mattson's absence by arguing that her witnesses' testimony should be given more weight because Mattson did not testify. Thus Radebaugh seeks to have it both ways: she sought to use Mattson's absence to her advantage at the administrative hearing but now claims that Mattson's failure to testify violated her due process rights. Those two arguments are opposed, rather than related, to one another, and Radebaugh fails to satisfy the second prong of the test.

Radebaugh also fails to satisfy the third prong. It is unclear how Radebaugh's argument could be gleaned from the pleadings after she failed to raise it in any previous proceedings. Radebaugh therefore fails to satisfy the conditions that would allow us to consider her argument despite failing to raise it below.

An argument not sufficiently raised may also be considered "if failure to address the issue would propagate plain error."[23] "Plain error exists if it appears that an

---

[22] *Erkins v. Alaska Tr., LLC*, 265 P.3d 292, 298 n.15 (Alaska 2011) (quoting *Sea Lion Corp. v. Air Logistics of Alaska, Inc.*, 787 P.2d 109, 115 (Alaska 1990)).

[23] *Id.* (quoting *Sea Lion Corp.*, 787 P.2d at 115).

obvious mistake 'has been made which creates a high likelihood that injustice has resulted.' "[24] But we conclude that the failure to address Radebaugh's argument was not plain error. Radebaugh had every opportunity to challenge her inability to cross-examine Mattson, but she chose instead to raise the issue as an argument going to the weight of the evidence. We decline to conclude that failing to address the argument amounts to an obvious mistake resulting in a high likelihood of injustice. We hold that Radebaugh waived her right to challenge her inability to cross-examine Mattson.

B.    **Substantial Evidence Supported The Department's Final Agency Decision.**

Radebaugh contends that the Department's final agency decision violated her due process right to a fair hearing because it reversed the ALJ's factual findings.[25] Her argument can be separated into two parts: (1) the Department's reversal of the ALJ's factual determinations is subject to heightened scrutiny and (2) the Department failed to provide adequate support for its decision to reject the ALJ's determination.

As a preliminary matter, we observe that the Department, as final decision maker, has the authority to overrule the ALJ's factual findings.[26]

---

[24]    *Sea Lion Corp.*, 787 P.2d at 115 (quoting *Miller v. Sears*, 636 P.2d 1183, 1189 (Alaska 1981)).

[25]    Radebaugh frames her argument in terms of due process, but the connection she draws between due process and the substantial evidence test is not clear. She appears to argue that the Department's alleged failure to satisfy the substantial evidence test amounts to a due process violation.

[26]    AS 44.64.060(e) authorizes the Department to reject the ALJ's factual findings:

The agency with authority to make a final decision in the case
retains agency discretion in the final disposition of the case
and shall . . . do one or more of the following:

(continued...)

### 1.     The substantial evidence test and heightened scrutiny

When reviewing final agency decisions, we review questions of fact under the substantial evidence test.[27]  "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' "[28]  "On appeal we do not re-weigh the evidence or choose between competing inferences, but we do analyze the record in its entirety to ensure that the ALJ's factual findings are supported by substantial evidence."[29]  In *Shea v. State* we explained that the substantial evidence test is highly deferential:

> the test "precludes affirmance of an agency finding in the extreme case where the evidence that detracts from the finding is dramatically disproportionate to the evidence that supports the finding, e.g., a finding based on the testimony of one obviously biased witness that is contradicted by the

---

[26](...continued)

> . . . .

> (4) in writing, reject, modify, or amend a factual finding in the proposed decision by specifying the affected finding and identifying the testimony and other evidence relied on by the agency for the rejection, modification, or amendment of the finding, and issue a final agency decision . . . .

[27]     *May v. State, Commercial Fisheries Entry Comm'n*, 175 P.3d 1211, 1216 (Alaska 2007).

[28]     *Handley v. State, Dep't of Revenue*, 838 P.2d 1231, 1233 (Alaska 1992) (citing *Keiner v. City of Anchorage*, 378 P.2d 406, 411 (Alaska 1963)).

[29]     *Shea v. State, Dep't of Admin., Div. of Ret. & Benefits*, 267 P.3d 624, 634 (Alaska 2011).

testimony of multiple unbiased witnesses or powerful documentary or circumstantial evidence."[30]

The United States Supreme Court has explained that while a court reviewing a record for substantial evidence may not "displace the Board's choice between two fairly conflicting views," "a reviewing court is not barred from setting aside a Board decision when it cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the Board's view."[31] We agree with this principle. Thus, we review the entire record "to ensure that the evidence *detracting* from the agency's decision is not *dramatically* disproportionate to the evidence supporting it such that we cannot 'conscientiously' find the evidence supporting the decision to be 'substantial.' "[32]

As an additional layer to the substantial evidence test, Radebaugh contends that when an administrative agency reverses the factual findings of an ALJ, we must apply a heightened level of scrutiny to the agency's final decision. She points to *Universal Camera v. National Labor Relations Board*, when the Supreme Court held that a reviewing court should consider an examiner's factual findings, even where that examiner's decision was ultimately reversed by the agency.[33] The Court determined that although the agency retained the authority to render a final agency decision, the

---

[30]     *Id.* at 634 n.40 (quoting RICHARD PIERCE, ADMINISTRATIVE LAW TREATISE 979–80 (Wolters Kluwer Law & Bus., 5th ed. 2010)).

[31]     *Id.* (quoting *Universal Camera Corp. v. Nat'l Labor Relations Bd.*, 340 U.S. 474, 488 (1951)).

[32]     *Id.* (emphasis in original).

[33]     340 U.S. at 497.

determinations of examiners who made factual determinations had increased importance.[34]

The Court in *Universal Camera* was clear that it was not setting out a new standard of review: the substantial evidence standard normally applied in administrative agency appeals "is not modified in any way when the Board and its examiner disagree."[35] But as a result of *Universal Camera*, "[e]ven though technically the [substantial evidence] standard of review remains in place, the agency can expect much more scrutiny of its factfinding when it disagrees with the administrative judge's credibility determination."[36] As such, "[i]f the administrative review authority disagrees with the administrative judge's credibility finding, the administrative judge's credibility judgment will likely be given special weight. . . . An administrative review authority which disagrees with such findings will face a heightened scrutiny."[37] "When the agency disagrees with the administrative judge, the weight given the administrative judge's decision will depend on the importance of credibility."[38]

Not only must substantial evidence support an agency decision, but the agency should also justify its results. According to Professor Koch, "[a] court does not sustain an agency decision if it finds the decision is correct but not adequately justified; rather the court remands so that the agency may either correct the reasoning or change

---

[34] *Id.* at 494-95.

[35] *Id.* at 496.

[36] 2 CHARLES H. KOCH, JR., ADMINISTRATIVE LAW AND PRACTICE § 5:64, at 256 (3d ed. 2010).

[37] *Id.* at 255.

[38] *Id.*

the results."[39]  A reviewing court "cannot provide the explanation itself," and "will not accept post-hoc rationalization in lieu of adequate explanation at the time the decision was made."[40]  But at the same time, a reviewing court should not upset an agency decision "if the agency's path may reasonably be discerned."[41]  When the agency's justification is adequate, and its path is at least reasonably clear, then the reviewing court will sustain the agency's decision.[42]

In Radebaugh's case, we conclude that the well-established substantial evidence test is the correct test.  The court reviewing an agency finding of fact will review the entire record to ascertain whether there is substantial evidence to support the agency's findings.  Where an agency's final decision rejects or reverses an underlying factual finding which was based on the fact-finder's credibility determination, the reviewing court should apply heightened scrutiny to the agency's final factfinding.  But the reviewing court does not re-weigh the evidence — its role under the substantial evidence test is merely to ascertain whether there is substantial evidence to support the agency's decision.

### 2. Substantial evidence supported the Department's final agency decision.

Having reviewed the entire record we conclude that there was substantial evidence to support the Department's final decision.  First, the 2012 CAT assessment concluded that Radebaugh's condition had improved since the initial CAT assessment

---

[39]      3 *id.* § 10:40, at 487.

[40]      *Id.* at 488-89.

[41]      *Id.* at 488 (quoting *Bowman Transp., Inc. v. Arkansas Best Freight Sys., Inc.*, 419 U.S. 218, 286 (1974)).

[42]      *Id.*

from 2005. Mattson determined that Radebaugh needed only "limited assistance" with transfers, locomotion, and toileting, and no assistance with bed mobility. Mattson substantiated her conclusions both with her personal observations and Radebaugh's own statements. For example, when asked about her transfers, Radebaugh stated "I use my walker." And Mattson observed Savage put weight on Radebaugh's walker while Radebaugh "independently got herself out of bed." There is no evidence that Radebaugh or Savage disputed Mattson's observations at the time Mattson recorded them, and the CAT assessment indicates Mattson reviewed her findings with Radebaugh and Savage. Moreover, Radebaugh did not refute any of the statements she made to Mattson during the course of performing the CAT assessment. Based on Radebaugh's statements and Mattson's observations, Mattson concluded that Radebaugh did not meet nursing facility level of care and instead required non-skilled custodial care.

Second, a review of the CAT assessment by Department nurse Sam Cornell reached the same conclusion: Radebaugh did not qualify for waiver services. Cornell noted that Radebaugh "receives custodial care for the completion of Activities of Daily [L]iving." He continued, "Transfer assistance provided is noted to be the assistant stabilizing the wheeled walker used by client for support during the transfer, and ambulates with the walker and supervision and cueing by the assistant." Based on those observations Cornell concluded, "In the 2012 assessment [Radebaugh] demonstrates improved self performance of the Activities of Daily Living which affect [w]aiver eligibility; she receives only limited levels of assistance. This level of assistance does not rise to the level required to demonstrate need for nursing home placement . . . ." Cornell testified consistent with his report at the administrative hearing.

Third, an independent review of the CAT assessment by Qualis Health confirmed that the scoring was consistent with the narrative information and the clinical diagnoses. At Radebaugh's administrative hearing Grace Ingrim from Qualis Health

testified that she reviewed a letter Dr. Erickson sent after Radebaugh requested a fair hearing and that another Qualis Health reviewer conducted a review of Radebaugh's case. Ingrim concluded that while Radebaugh's clinical status had not changed, her treatment plan had changed and was consistent with the CAT assessment results.

Fourth, the CAT assessments from 2007 through 2011 documented that Radebaugh was functioning better than in 2005. For example, in 2007 the CAT assessment indicated that Radebaugh needed limited assistance with transfers and locomotion but needed no assistance in bed mobility and toileting. In 2008 the CAT assessment reported that Radebaugh was independent in bed and required only limited support in toileting. From 2009-2011 the CAT assessments indicated that Radebaugh needed only limited assistance with activities of daily living.

Radebaugh's witnesses did present evidence that detracts somewhat from the CAT assessment's conclusion. Savage testified that she routinely provided weight-bearing assistance to Radebaugh during transfers, even on her good days when Radebaugh did not require as much support. As to toileting, Savage testified that she provided even greater weight bearing assistance, helping Radebaugh get on and off the toilet several times each day. Regarding locomotion, Savage testified that she sometimes supported Radebaugh's weight but at other times only provided cues to Radebaugh as she used her walker. But Savage did not testify that Radebaugh required extensive assistance with her eating or bed mobility, two of the five categories of activities of daily living. And importantly, Savage did not testify that the observations Mattson recorded in the CAT assessment were false or misleading. Based on Savage's testimony, it was reasonable to find that Radebaugh required no assistance for two of the five activities of daily living (bed mobility and eating), required extensive assistance for two of the five activities (transfers and toileting), and required only limited assistance for one of the

activities (locomotion). Those results would not be sufficient to qualify Radebaugh for waiver services.

Savage also testified that Radebaugh went to physical therapy three days a week which, if true, would likely make Radebaugh eligible for intermediate nursing services even if combined with the results of the CAT assessment.[43] But the CAT assessment indicated that Radebaugh did not attend physical therapy, and Dr. Erickson, Radebaugh's treating physician, testified that while Radebaugh did need physical therapy, he could not say whether Radebaugh needed a physical therapist.

Dr. Erickson was also fairly equivocal when discussing Radebaugh's mobility. He testified that Radebaugh could get up on her own with the use of assistive devices and that, while Radebaugh "may have difficulty with getting her legs moving early in the morning," she "moves better once she gets going" and "gets limbered up and whatnot." This was true despite the fact that Radebaugh's degenerative disc disease had regressed over time, which negatively impacted her ability to function and put her on "a slow, steady decline." He later stated that Radebaugh did not need more care than what a personal care assistant could provide.

The ALJ determined that Radebaugh's witnesses were credible, so we give their testimony special weight on review. And we do not ignore the fact that the ALJ found that Radebaugh required "extensive assistance" in the daily activities of transfers, locomotion, and toileting. But when evaluating the totality of the evidence, we conclude that there was substantial evidence in the record to support the Department's final

---

[43] Under the CAT, an individual "appears to be medically eligible for [nursing facility] level of care" if he or she attends therapy three to four days per week and has some combination of limited or extensive assistance and a one-person physical assist for at least two activities of daily living. Radebaugh's 2012 CAT assessment indicated that she required limited assistance with a one-person physical assist for transfers, locomotion, and toileting.

decision. This is not a case where "the evidence that detracts from the finding is dramatically disproportionate to the evidence that supports the finding."[44] We hold that the totality of the evidence in the record provides a sufficient basis to support the Department's final decision.

### 3. The Department adequately supported its final decision.

Radebaugh finally argues that the Department failed to adequately explain its decision, and the Department therefore failed to satisfy the heightened scrutiny applied to its decision. Radebaugh contends that the Department inadequately explained "why [it] was rejecting the eyewitness testimony of Ms. Radebaugh's treating physician and primary caregiver."

The Department's final agency determination stated that the ALJ's proposed decision "is revised to reflect the opposite result. More specifically, the evidence in this case demonstrates that Ms. Radebaugh's condition has materially improved and as a result, the [Department's] decision terminating her [w]aiver services is AFFIRMED." The decision concluded that the ALJ failed to give proper weight to the CAT assessment while giving excessive weight to Radebaugh's witnesses. After reviewing the evidence, the decision found that the Department had properly terminated Radebaugh's waiver services.

The decision pointed to several key pieces of evidence that favored the Department. First, multiple nurses reviewed the CAT assessment, and all of those reviews supported the decision to terminate Radebaugh's waiver services. Second, the decision directly responded to the ALJ's opinion by noting that the third-party review considered not just the CAT but also other documents and so deserved evidentiary

---

[44] *Shea v. State, Dep't of Admin., Div. of Ret. & Benefits*, 267 P.3d 624, 634 n.40 (Alaska 2011) (quoting RICHARD PIERCE, ADMINISTRATIVE LAW TREATISE 979–80 (Wolters Kluwer Law & Bus., 5th ed. 2010)).

weight.  Third, the decision noted that the ALJ failed to account for Matton's eyewitness observations of Radebaugh, as expressed in her notes in the CAT.  Those explanations are sufficient to satisfy the requirement as described by Professor Koch that "the agency's path [must] reasonably be discerned."[45]  We conclude that the Department addressed the material and contested pieces of evidence including the CAT assessment, the witnesses supporting the CAT assessment, Radebaugh's witnesses, and the weight applied to each piece of evidence.  Because the Department provided a sufficient explanation of its thought process in reversing the ALJ's credibility determinations, and because the Department's decision was supported by substantial evidence, we uphold its decision.

## V.  CONCLUSION

We hold that Radebaugh waived her right to challenge her inability to cross-examine Mattson and that the Department did not violate Radebaugh's due process rights when it issued its final decision.  We also hold that the Department's decision is supported by substantial evidence.  We therefore AFFIRM the superior court's affirmance of the Department's final agency decision.

---

[45]     3 KOCH, *supra* note 36, § 10:40, at 488.